[No. B170730. Second Dist., Div. Six. Aug. 26, 2004.]

SAFECO INSURANCE COMPANY OF AMERICA, Plaintiff and Appellant,
v.
JAMEY LYNN PARKS et al., Defendants and Respondents.

## COUNSEL

LaTorraca and Goettsch, Raymond H. Goettsch and Scott K. Murch for Plaintiff and Appellant.

Pulverman & Pulverman, Martin E. Pulverman, Raymond J. Pulverman and James S. Bianchi for Defendant and Respondent Jamey Lynn Parks.

Law Offices of Wayne McClean and Wayne McClean for Defendant and Respondent Michele Miller.

## OPINION

**YEGAN, J.**—Safeco Insurance Company of America (Safeco) appeals from the judgment, after a nonjury trial, declaring that it breached its duty to defend and to indemnify Michelle Miller in a negligence action brought against her by her former boyfriend, Jamey Lynn Parks. Safeco contends it owed no duty to defend Miller because she was not an insured under a homeowners policy it issued to the man with whom her mother was living when Parks was injured, and because the policy excludes coverage for injuries arising out of the use of an automobile. Parks and Miller contend that Miller meets the policy's definition of an insured and that the automobile

exclusion does not apply. We conclude the trial court erred in finding that Safeco had a duty to defend Miller. Safeco reasonably declined the defense because the information then made available to Safeco by its insured and other interested parties disclosed no potential that Miller was an insured under the policy. Accordingly, we reverse. We affirm a previously made discovery sanction order.

*Facts*

*Parks's Injuries and Complaint Against Miller*

Michelle Miller was 17 years old on the night of February 29, 1999, when she went "clubbing" in Santa Barbara with her then boyfriend, 21-year-old Jamey Parks. Miller drove on the trip back to Santa Maria because Parks was very intoxicated. Along the way, the car had a flat tire. Parks was angry about the flat and became violent with Miller. According to Miller, he hit her several times while they waited for her friend, Teresa Cooney, to pick them up and drive them home. Cooney arrived in her car about 3:30 a.m. Isaiah Rivera, a friend of Cooney's was driving Cooney's car. During the trip home, Parks again became violent with Miller and was left alone on the freeway shoulder. Rivera, Cooney and Miller drove back to Santa Maria without him.[1]

When they arrived in Santa Maria, Cooney and Rivera dropped Miller off at her father's house. Miller telephoned Parks's brother and told him that Parks needed a ride home. After that conversation, she went to sleep.

Left to his own devices, Parks began walking back toward his disabled car. He eventually wandered into the traffic lanes of the freeway, where he was hit by a passing motorist. As a result of the collision, one of Parks's legs was amputated and he sustained many other serious, permanent injuries.

Parks sued Miller, Cooney and Rivera for negligence. Cooney's automobile insurer, California Casualty Insurance Company, provided all three with a defense. It eventually settled Parks's claims against Cooney and Rivera for the policy limits of $30,000. The parties stipulated to binding arbitration of Parks's claims against Miller. That proceeding resulted in an award and subsequent judgment against Miller for $2,187,886. She settled with Parks by assigning to him any claims she might have against Safeco.

---

[1] Miller maintained that they left Parks in his stranded car because he refused to get into Cooney's car and leave with them. Based on Parks's location at the point of impact and other facts, the arbitrator found that Parks must have ridden with the group for some distance before he was put out of the car.

*The Insurance Dispute*

*The Safeco Homeowners Policy*

When Parks suffered his injuries, Miller's parents were divorced. Her father, Charles Miller, had sole legal and sole physical custody of Miller and lived in rental housing at 821 David Road in Santa Maria. Miller spent at least some time staying with her mother, Gloria Barnette. At the time of the accident, Gloria Barnette lived with, but was not yet married to Eddie Barnette. The couple lived in a house he owned at 340 Townsend Lane in Santa Maria.[2]

Safeco issued a homeowners policy to Eddie Barnette for the Townsend Lane house. Among other things, the policy provides, "If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, [Safeco] will: [¶] 1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and [¶] 2. provide a defense at our expense by counsel of our choice even if the allegations are groundless, false or fraudulent. . . ."[3] It defines the term "insured" to mean, "you [the named insured] and the following residents of your household: [¶] a. your relatives; [¶] b. any other person under the age of 21 who is in the care of any person named above." The policy also contains an "auto exclusion" that excludes coverage for bodily injury or property damage "arising out of the ownership, maintenance, use, loading or unloading of: [¶] . . . . [¶] (a) [¶] motor vehicles or all other motorized land conveyances, including any trailers, owned or operated by or rented or loaned to an insured[.]"

*Notice to Safeco*

Miller was represented in the Parks lawsuit by Richard Phillips, the attorney retained by California Casualty. In March 2001, Phillips put Safeco on notice of the Parks lawsuit against Miller. In subsequent conversations and correspondence with the Safeco claims adjuster, Mick Pagach, Phillips and his associates represented that Miller lived primarily with her father, Charles, who had sole legal and sole physical custody of her and provided for her

---

[2] After Gloria Barnette divorced Miller's father Charles, she married Ralph Barnette, Eddie's brother. Gloria and Ralph divorced in 1997. In 1998, Eddie Barnette moved into a house Gloria owned. Later that same year, the couple moved to the house Eddie owned at 340 Townsend Lane where they lived when the accident occurred. Eddie and Gloria were married in January 2000.

[3] An "occurrence" is defined by the policy as an accident which results in bodily injury or property damage during the policy period. Bodily injury is defined to include "bodily harm, sickness or disease . . . ."

financially. Phillips assisted Miller in providing answers to interrogatories and represented her at her deposition in the Parks lawsuit. On both occasions, Miller stated that she lived with her father Charles at 821 David Road. Parks's attorney, Martin Pulverman, told Pagach that he believed Miller spent about half of her time at Barnette's house. He provided Pagach with no evidence to support that assertion. In mid-April 2001, Safeco declined the defense of Miller. On October 8, 2001, Miller's counsel again tendered her defense to Safeco. Safeco did not respond or alter its earlier denial.

### Safeco's Knowledge of Miller's Residence

After Safeco was notified of the Parks lawsuit, Mick Pagach, its claims adjuster, had conversations with Eddie Barnette, Gloria Barnette, and counsel for Parks and Miller. Pagach reviewed the California Highway Patrol accident report concerning the incident, the pleadings in the Parks lawsuit, and the transcript of Miller's deposition in that matter. Safeco declined the defense in April 2001. Thereafter, Miller's counsel provided Safeco with transcripts of the depositions of Eddie Barnette, Gloria Barnette and Jennifer Parker, a former friend of Miller's. Counsel also provided Safeco with a summary of the deposition testimony of Charles Miller.

The tendered information demonstrated that, at the time Parks was injured, Miller resided part of the time with her father, Charles. She used her father's address on her driver's license, the California Highway Patrol accident report, and at her deposition in the Parks lawsuit. Miller testified at her deposition that, on her return from Santa Barbara, she went to her father's house on David Road, not to Barnette's house on Townsend Lane. Miller also testified that she lived with her dad on David Road and nowhere else. Although she spent "quite a bit" of time at the Townsend Lane house, "All my things were at my dad's house. I would stay with my mom for weekends and things sometimes."

In conversations and correspondence with the Safeco claims adjuster, Eddie Barnette denied that Miller was a resident of his household, that he had any legal relationship with her, or that he provided her with financial support. Barnette said that Miller was living with her father full time at the time of the accident. She stayed the night at Barnette's house every couple of months. When she stayed over, Miller used the guest room. Although she kept some clothes on the floor of the guest room, she did not have a room of her own in the house. Barnette made similar statements in letters to Parks's counsel.

Eddie Barnette's deposition testimony was consistent with these statements. He testified that, when he and Gloria first moved into the Townsend Lane house, the guest room was in disrepair. It had no lights, bad paint and

holes in the wall. The room was remodeled in January or February of 1999. Miller did not pay rent, food, utilities or other bills at his house. She was not expected to do chores. She had some overnight guests, but Parks was not allowed to stay over. Miller did not have a key to the house or have permission to drive Eddie Barnette's cars. She received telephone calls at the Townsend Lane house on a second line that Eddie Barnette had installed when his father lived there. Miller kept clothing on the floor of the guest room. During the time that Gloria was married to Eddie's brother, Ralph, Eddie did not think of himself as Miller's uncle. He did not see much of Miller and could not recall an occasion on which she stayed at his house from Friday to Sunday. Eddie Barnette died before the trial in the insurance bad faith matter.

Gloria Barnette confirmed Eddie's account in her statement to Pagach and her deposition testimony in the Parks lawsuit. She stated that her daughter stayed over about once a month and otherwise lived with her father. Miller never resided at the Townsend Lane house. She did not have a key but was sometimes there when no adults were present. She received telephone calls at the house, but Gloria testified she was not aware that Miller used a separate line or voice mail box. Miller stayed in the guest room, which Gloria Barnette described as uncomfortable. The adjoining bathroom was not usable. Miller sometimes had overnight guests at the house, although Parks was not allowed to stay the night. Miller did not have to pay rent or for food at the house. She did not do chores. She did not have a curfew. Miller did not call Eddie Barnette "dad, pops, daddy" or "poppa." Gloria testified she was "positive" that Miller's car was registered at her father's address on David Road. Miller did not have permission to drive Gloria Barnette's car.

Charles Miller, Miller's father, testified in his deposition that he had custody of her. On one occasion, according to Charles Miller, Miller got mad at her father and stayed with her mother at the Townsend Lane house for almost two weeks. Otherwise, she lived with Charles Miller, except for occasional weekend visits to her mother.

Jennifer Parker, a high school friend of Miller's, testified that between June 1998 and February 1999, she stayed the night with Miller at the Townsend Lane house at least twice a month. Parker tried to visit when the adults were not home. Miller had a room in the house with an adjoining bathroom that was operational. Miller kept clothing, shoes, furniture, knick-knacks, art work and other personal belongings in her room. She lived there for a few months after Parks's accident. Parker thought that Miller had a key to the house. She sometimes went inside when no adults were home. Parker estimated that Miller spent at least half of her time at the Townsend Lane house. She moved from one parent's house to the other house every couple of months, whenever

she got irritated with one of her parents. Parker and Miller were no longer close friends at the time Parker gave her deposition.

## The Bad Faith Litigation

After the arbitration award against Miller was confirmed, she assigned to Parks her claims against Safeco. Parks sued Safeco for breach of contract, alleging that it failed in bad faith to settle his claims against Miller within the policy limits. Safeco filed a declaratory relief action, contending it owed no duty to defend or indemnify Miller. Miller also filed a cross-complaint against Safeco, for bad faith refusal to defend and settle Parks's claims against her. The matters were consolidated. Safeco moved for summary judgment, contending the auto exclusion precluded coverage for Parks's injuries and that Miller was not an insured under the policy. Both motions were denied. The parties tried the declaratory relief action to the trial court sitting without a jury. After a three-day trial, the trial court found that Safeco had a duty to defend Miller and to indemnify her for the entire $2,187,886 judgment against her. The parties agreed to stay Parks and Miller's bad faith claims so that judgment could be entered on the declaratory relief complaint and Safeco could pursue this appeal.

## Testimony in the Bad Faith Litigation

At the trial in the bad faith and declaratory relief action, Michelle Miller and Gloria Barnette testified that they had been pressured by the now-deceased Eddie Barnette to lie in their previous testimony. Barnette did not want Safeco to cover Parks's injuries because he was afraid he would have to pay a high deductible. To avoid coverage, Barnette instructed his wife and Miller to say that Miller rarely stayed at his house and that she was not close to him.

In their trial testimony, the women agreed that Miller stayed weekends with her mother at least twice each month. As a teenager, Miller acquired a habit of moving to one parent's house whenever she had an argument with, or chafed against rules imposed by the other. That living arrangement would last until the next argument or unwelcome restriction, when Miller would switch to the other house. She had her own room at Barnette's house. It was decorated and she kept furniture, clothing and other personal belongings there. She also had overnight guests at the house. Miller did not have a key. On one occasion, she entered the house through a window because no one was there to let her in.

Miller and her mother both testified that Eddie Barnette was a friend and sometimes a confidante of Miller's. He gave her cash for tuition and books so

she could complete her high school education at a local community college. Barnette did not expect Miller to repay him. She sometimes talked to him about matters she would not discuss with her parents. She did not call him "dad."

Gloria Barnette testified that Miller was very close to Eddie Barnette, who acted not like a father, "but more of a guiding friend" to Miller. He gave her money, helped with her school work, and helped her fix her car. Miller sought out his advice on finances and dating. Eddie disciplined Miller more than Gloria did. Gloria thought that Eddie was "more of a better parent than I was." Gloria claimed Miller as a dependent on her 1998 and 1999 federal tax returns. Miller's car was registered at the Townsend Lane address.

Miller testified that Eddie loaned her money but did not expect to be paid back. They sometimes went to the movies, the casino or out to lunch together. Miller confided in Eddie. When Parks's accident occurred, Miller was living with her father on David Road. Parks picked Miller up at that address and she returned there that night.

### The Trial Court's Findings

The trial court concluded that Miller was an insured under the Safeco policy issued to Eddie Barnette because she was a resident of his household and under his care. It made several factual findings to support that conclusion. Among other things, the trial court found that Miller was a part-time resident of both Barnette's household and her father's household. She was a resident of the Townsend Lane house because she "had her own room at 340 Townsend Lane[,]" that housed "her own furniture, clothing, cosmetics, photos, candles and knickknacks . . . . She had friends visit and spend the night . . . . She received telephone calls on a separate telephone number." Miller was under Barnette's care because she did not perform chores at the house, he provided food and shelter for her, he "enforced rules regarding [her] behavior while in his home . . . ," and he "expressed concern for [her] well being."

The trial court also relied on Miller's use of the Townsend Lane address on a job application, a vehicle registration, a tax return and a school registration form. Eddie Barnette loaned Miller money to enroll in a continuation high school and to buy books. He occasionally drove her to school, doctor's appointments or social events like meals and movies. Finally, the trial court accepted "as credible the testimony of Gloria Barnette, who testified that Eddie Barnette was a better parent to Michelle Miller than she was. While they both established parental rules for Michelle Miller to follow, Eddie Barnette enforced the rules similar to the rules that Charles Miller placed on

her. He required her to come in at a reasonable hour and that her boyfriend could not spend the night. She was also asked to clean up her room. All of this took place from the time of their move to 340 Townsend Lane in July 1998 through February 1999." Because Safeco breached its duty to defend Miller, it was bound by and liable for the entire amount of the judgment entered in the Parks lawsuit.

The trial court found that the Safeco policy provided coverage for Parks's injuries because the auto exclusion did not apply. According to the trial court, Miller had a special relationship to Parks because she undertook to help him when he was too intoxicated to help himself. She breached her duty to Parks "when she abandoned him with knowledge that he could not take care of himself. Her breach of duty was not dependent upon her use of either the Parks or Cooney vehicles. Rather, the use of the vehicles merely altered the location of where Mr. Parks's injuries occurred."

### Contentions on Appeal

Safeco contends that it did not owe a duty to defend Miller because, at the time it declined the tender of her defense, Safeco had no information demonstrating a potential that she was a resident of Barnette's household or in his care. It also contends that it had no duty to indemnify Miller because Parks's injuries arise out of Miller and Rivera's "use, loading or unloading of" an automobile and the auto exclusion therefore applies. Parks contends Safeco owed a duty to defend Miller because the facts known to Safeco at the time it declined the defense and those it could have learned had it conducted a more thorough investigation raised the potential that Miller qualified as an insured under the policy. He contends the auto exclusion does not apply because his injuries arose out of Miller's negligent abandonment of him on the freeway, not her use of his car or Cooney's car.

### Standard of Review

"When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law." (*Waller v. Truck Ins. Exchange Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Accordingly, we exercise de novo review, determining independently the meaning of the policy. (*Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].)

Here, the trial court also made findings of fact concerning Miller's visits to the insured premises and her relationship with the now deceased Eddie Barnette. Although the findings are consistent with evidence in the trial

record, we conclude they are irrelevant to the question whether Safeco breached a duty to defend Miller because the findings are based entirely on facts that were unknown to and concealed from Safeco before Safeco declined the defense. In statements, correspondence, declarations and depositions given before Safeco declined the defense, all of the interested parties, including Miller, her parents and named insured Eddie Barnette insisted that Miller did not reside in Barnette's household and was not under his care. Their statements to the contrary, whether truthful or not, were made only after Safeco declined to defend Miller. As a result, they are irrelevant to the question whether Safeco breached a duty to defend her. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272]; *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538–539 [12 Cal.Rptr.2d 629].) Because the facts known to Safeco before it declined the defense eliminated potential coverage for Parks's claims against Miller, we conclude Safeco had no duty to defend Miller.[4]

## Discussion

### The Duty to Defend

■ It is a "fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." (*Waller v. Truck Ins. Exchange, supra,* 11 Cal.4th at p. 19.) Where the facts create no potential for coverage, however, there is no duty to defend. (*Ibid.*) "Thus, when a suit against an insured alleges a claim that potentially could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that *the claim cannot be covered.* In order to establish a duty to defend, an insured need only establish the existence of a potential for coverage; while to avoid the duty, the insurer must establish the *absence* of any such potential." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1186 [96 Cal.Rptr.2d 136].) Doubts concerning the potential for coverage, and therefore, the existence of a defense duty must be resolved in favor of the insured. (*Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th at pp. 299–300.)

---

[4] We recognize that "[t]he defense duty is a continuing one . . . lasting until the underlying lawsuit is concluded [citation] . . . ." (*Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th at p. 295.) Here, the trial court's findings are based on information, that, with the exception of the Parker deposition, came to Safeco's attention only after the underlying lawsuit was concluded.

█ As our Supreme Court noted in *Montrose,* whether an insurer has a duty to defend its insured against a third party complaint is determined as of the time of "the inception of the third party lawsuit." (*Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th at p. 295.) The insurer does so "by reference to the policy, the complaint and *all* facts known to the insurer from any source." (*Id.* at p. 300.) As an initial step, the allegations of the complaint are compared with the terms of the policy. "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) These facts must be "*known by the insurer* at the *inception* of the third party lawsuit; and . . . the duty to defend ceases as soon as it has been shown that there is no potential for coverage." (*Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at p.1114.) Extrinsic facts obviate the insurer's defense duty where they are undisputed and conclusively eliminate the potential that the policy provides coverage for the third party's claim. (*Waller v. Truck Ins. Exchange, supra,* 11 Cal.4th at p. 19; *Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th at pp. 299–300.)

Barnette's homeowners policy included a promise by Safeco to defend and indemnify its "insured." The policy provides that Miller is an insured if she was a resident of Barnette's household and was under his care when the Parks accident occurred. Safeco was not obligated to provide Miller with a defense unless the facts known to it revealed that she was an "insured" under the terms of the policy. We conclude that they did not.

### 1. *Residence.*

█ Determining, for insurance purposes, the residence of a child whose parents are divorced is not always a straightforward matter. Such a child may have more than one residence at the same time. (*Utley v. Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 820 [24 Cal.Rptr.2d 1].) The term "residence" connotes " 'any factual place of abode of some permanency, more than a mere temporary sojourn . . . .' " (*Ibid.,* quoting *Smith v. Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497].) Thus, a child who spends substantially equal amounts of time with each parent on a regularly rotating basis can be said to reside with each parent. (*Kibbee v. Blue Ridge Ins. Co.* (1999) 69 Cal.App.4th 53, 61–62 [81 Cal.Rptr.2d 294]; *Utley v. Allstate Ins. Co., supra,* 19 Cal.App.4th at p. 821–822; *National Automobile & Casualty Ins. Co. v. Underwood* (1992) 9 Cal.App.4th 31, 41–42 [11 Cal.Rptr.2d 316]; *Safeco Ins. Co. v. Gibson* (1989) 211 Cal.App.3d 176, 184 [259 Cal.Rptr. 206].) "This understanding is consistent with dictionary definitions of the term 'resident' as one ' "who dwells in a place for a period of some duration" ' and 'residence' as ' "a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary

sojourn or transient visit." ' (Webster's New Internat. Dict. (3d ed. 1961) p. 1931 . . . .)" (*Kibbee v. Blue Ridge Ins. Co, supra,* 69 Cal.App.4th at pp. 61–62.) By the same token, a child who visits one parent only infrequently and does not maintain a room or personal belongings at that parent's home may not be a resident of that parent's home, especially where no permanent visitation schedule is in place. (*Id.,* at pp. 62–63; *National Automobile & Casualty Ins. Co. v. Underwood, supra,* 9 Cal.App.4th at pp. 41–42.)

### 2. *Household.*

■ To qualify as an insured under the policy, Miller must also have been a member of Barnette's household and under his care. The term "household" may be somewhat antiquated, as the trial court pointed out, but our Supreme Court held in *Island v. Fireman's Fund Indemnity Co.* (1947) 30 Cal.2d 541 [184 P.2d 153], that the term is generally synonymous with "family" and embraces " 'a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness." ' " (*Id.* at p. 548, quoting *Lumbermens Mutual Casualty Co. v. Pulsifer* (D.Me. 1941) 41 F.Supp. 249, 251.) More recently, the court in *Jacobs v. Fire Ins. Exchange* (1991) 227 Cal.App.3d 584 [278 Cal.Rptr. 52], followed *Island* and held that a household includes family members and others who live together in the same place and who recognize "a common source of authority or leadership to which the other members of the household are subject. Thus, a 'head' may be a father, a mother, both parents acting together, or some other person whom the members of the household recognize as their ' head.' " (*Id.,* at p. 594, fn. 5.)

### 3. *Miller's Status as an Insured.*

The extrinsic facts known to Safeco before it declined the defense established that Miller did not meet the policy definition of an insured. First, Eddie and Gloria Barnette represented to Safeco that Miller was not a resident of the insured premises. Miller made the same representations to law enforcement and in her depostition in the Parks lawsuit. Although she used the Townsend Lane address for other purposes, such as her vehicle registration and some tax documents, Miller never informed Safeco of that fact. Safeco was entitled to rely on statements by its insured and the other interested parties to conclude that Miller did not reside at 340 Townsend Lane.

Even if the facts known to Safeco raised a possibility that Miller resided at the insured premises, there was no evidence that she was a member of Eddie

Barnette's household or under his care. Again, the Barnettes and Miller failed to disclose to Safeco information tending to show a familial relationship between Eddie Barnette and Miller, such as Barnette's disciplining Miller or providing financial support to her. Instead, they consistently denied that Eddie Barnette had any responsibility for supporting, parenting or disciplining Miller. These statements eliminated the possibility that she was an insured within the meaning of the policy.

Before Safeco declined the defense, Miller and the Barnettes presented a united front to Safeco, consistently denying that Miller was a member of Eddie Barnette's household or under his care. The Barnettes maintained that Miller did not live at the Townsend Lane house, have a key to it or have their permission to enter the house when they were absent. They told Safeco that Miller visited periodically, slept in the unfinished guest room and kept few, if any personal belongings at the house. She did not visit on a fixed schedule, stay for any particular length of time or to return at any predetermined interval. Miller was instead allowed to come and go whenever the mood struck her. She was free to eat whatever food might be in the house, but she was not expected to perform any chores or otherwise contribute to the support of the family. Eddie Barnette said that he provided no financial support for Miller and had no responsibility for disciplining her. Charles Miller confirmed that he had custody of Miller and that she lived at his house.

Miller's statements to law enforcement and her deposition testimony in the Parks lawsuit were consistent with the other information provided to Safeco. When questioned by the highway patrol about Parks's accident, Miller said she lived at her father's address and that she returned to her father's house after the night out with Parks. She also used her father's address at her deposition in the Parks lawsuit. During her deposition, Miller testified that she lived at her father's house and nowhere else. Although she visited her mother at Eddie Barnette's house, she did not live there or keep personal belongings there. She did not call Barnette, "Dad," or refer to him as a parent or authority figure.

In short, every person actually involved in the relationship between Miller and the Barnettes informed Safeco that Miller lived with and was financially supported by her father, but periodically stayed with her mother and the man with whom her mother lived. There was no evidence made available to Safeco that Miller considered herself to live on a permanent, or even predictable basis, at the insured premises, to be a member of a family unit that included Eddie Barnette, or to be subject to his discipline or parenting. Instead, the only evidence disclosed to Safeco before it declined the defense indicated that Miller was more like a guest in Barnette's house than a resident

of it. These undisputed facts established that Miller was not an insured within the meaning of the policy. Safeco had no duty to defend her and did not act in bad faith by declining to do so.

Parks notes that Gloria Barnette claimed Miller as a dependent on her 1998 federal income tax return and that Miller used the Townsend Lane address on her car registration, some tax documents and a job application. He contends that Safeco would have found this documentary evidence that Miller was a resident of the insured premises had it conducted a reasonable investigation. The documents and Jennifer Parker's deposition testimony, he contends, disclose a potential that Miller qualified as an insured under the policy, and therefore is potentially covered under the policy. Parks concludes that Safeco acted unreasonably in declining the defense because it did not search for the tax and vehicle records necessary to contradict Eddie Barnette's statements, and because it resolved the conflict between Jennifer Parker's testimony and Eddie Barnette's statements against its potential insured, Miller, rather than in her favor. We are not persuaded.

Safeco "does not have a continuing duty to investigate whether there is a potential for coverage. If it has made an informed decision on the basis of the third party complaint and the extrinsic facts *known* to it at the time of tender that there is no potential for coverage, the insurer may refuse to defend the lawsuit." (*Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at p. 1114.)

Safeco's initial decision to decline the defense was an informed one. Before making it, Safeco reviewed its policy, the accident report, Miller's deposition in the Parks lawsuit, and statements obtained from its insured, from Gloria Barnette and from Miller's counsel. These individuals did not disclose to Safeco the documents that Parks now contends would have established Miller's status as an insured. Instead, they concealed all of this information and affirmatively denied that Miller qualified as an insured under the policy.

Safeco learned of Parker's deposition testimony in October 2001, months after its April 2001 decision to decline Miller's defense and only a few weeks before the arbitration hearing. Safeco is not obligated to change its decision based on the earlier deposition alone. Parker was not a member of Miller's family or of Barnette's. She described herself as a frequent guest of Miller's who tried to visit the Townsend Lane house when the adults were not present. Safeco made an informed decision that Miller and the Barnettes were in a better position to understand their relationship to one another than was Parker. It did not act unreasonably when it failed to take her word over that of its insured.

*Discovery Orders*

Safeco contends the trial court erred in two discovery rulings. First, it granted a protective order against the depositions of Parks's trial counsel. Second, it denied Safeco's motion to compel Parks to answer deposition questions concerning his financial condition, criminal record and sexual experiences. In that same ruling, the trial court imposed $1,800 in sanctions against Safeco's counsel, Scott K. Murch, after finding that he brought the motion to compel without substantial justification. Safeco contends these rulings were an abuse of discretion. We disagree.

Our reversal of the judgment makes review of the protective order unnecessary. Safeco sought to depose Parks's trial counsel concerning their efforts to obtain insurance coverage for Miller and the presence of collusion in Parks's settlements with Cooney and Rivera. These matters are relevant only to the question of whether Safeco acted in bad faith when it declined to defend Miller. We have already determined that Safeco had no duty to defend as a matter of law. No additional discovery on that issue is required and we need not determine whether the trial court abused its discretion in entering the protective order.

The trial court's order denying the motion to compel Parks's deposition testimony is moot for the same reason. We review the order imposing sanctions under the deferential abuse of discretion standard. (*R.S. Creative, Inc. v. Creative Cotton Ltd.* (1999) 75 Cal.App.4th 486, 496 [89 Cal.Rptr.2d 353]; *Argaman v. Ratan* (1999) 73 Cal.App.4th 1173, 1176 [86 Cal.Rptr.2d 917].) The trial court did not abuse its discretion when it found that Murch made no "reasonable and good faith attempt to resolve [this dispute] informally," and acted without substantial justification by refusing to withdraw the motion when Parks agreed to answer additional questions. (Code Civ. Proc., §§ 2023, subd. (a)(8), (9), 2025, subd. (o).) Murch sent one letter demanding additional discovery and then pronounced further discussion of the matter "a waste of time for all involved." He filed the motion to compel only seven days after sending the initial letter. On that same day, Parks offered to make himself available for additional questioning. Rather than declare victory and withdraw the motion, Murch pronounced the offer, "too little, too late." The combative and unprofessional tone of this correspondence amply supports the trial court's decision to impose sanctions.

*Conclusion*

The May 19, 2003 order imposing sanctions against Safeco's counsel is affirmed. In all other respects, the judgment is reversed. Costs to Safeco.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied September 23, 2004, and the opinion was modified to read as printed above. The petition of respondent Jamey Lynn Parks for review by the Supreme Court was denied December 22, 2004. Werdegar, J., did not participate therein.