[No. B188723. Second Dist., Div. Seven. June 22, 2007.]

CALIFORNIA VETERINARY MEDICAL ASSOCIATION, Plaintiff and
Respondent, v.
CITY OF WEST HOLLYWOOD, Defendant and Appellant.

## Counsel

Eisenberg, Raizman, Thurston & Wong, Orly Degani; Sedgwick, Detert, Moran & Arnold, Orly Degani; and Michael Jenkins, City Attorney, for Defendant and Appellant.

Gibson, Dunn & Crutcher, George A. Nicoud III, Sarah E. Piepmeier, Perlette Michele Jura, Kahn A. Scolnick and Vanessa C. Adriance for Animal Legal Defense Fund, The Association of Veterinarians for Animal Rights and the Paw Project as Amici Curiae on behalf of Defendant and Appellant.

Dennis J. Herrera, City Attorney, Danny Chou, Deputy City Attorney, for the City and County of San Francisco as Amicus Curiae on behalf of Defendant and Appellant.

Wilke, Fleury, Hoffelt, Gould & Birney and Daniel L. Baxter for Plaintiff and Respondent.

## Opinion

**PERLUSS, P. J.**—Echoing Gandhi's teaching that a society's moral progress is best judged by its treatment of animals,[1] the City of West Hollywood has banned as cruel and inhumane the practice of animal declawing unless necessary for a therapeutic purpose. Believing West Hollywood's prohibition

---

[1] In his speech, The Moral Basis of Vegetarianism, delivered to the London Vegetarian Society on November 20, 1931, Mahatma Gandhi said, "The greatness of a nation and its moral progress can be judged by the way its animals are treated." Gandhi's statement is quoted and a link to his speech on the Web site of the International Vegetarian Union is provided in Note, *Greyhounds: Racing to their Deaths* (2003) 32 Stetson L.Rev. 433, 464 and footnote 216.

of recognized veterinary medical procedures within its city limits was both inappropriate and ill advised, the California Veterinary Medical Association (CVMA) filed an action for declaratory and injunctive relief, asserting the ordinance was preempted by the California Veterinary Medical Practice Act (VMPA or Act) (Bus. & Prof. Code, § 4800 et seq.) and by Business and Professions Code section 460, which precludes cities and counties from prohibiting certain individuals licensed by the state from engaging in their business or profession "or any portion thereof."[2]

On cross-motions for summary judgment the trial court concluded West Hollywood's anti-declawing ordinance was preempted by section 460 and entered judgment in favor of the CVMA, declaring the ordinance invalid and enjoining further enforcement. We reverse. Although section 460 prohibits local legislation imposing separate and additional licensing requirements or other qualifications on individuals holding state licenses issued by agencies of the Department of Consumer Affairs (DCA), it does not preclude otherwise valid local regulation of the manner in which a business or profession is performed. Similarly, although West Hollywood's adoption of an anticruelty measure prohibiting nontherapeutic declawing of animals has an incidental impact on veterinarians practicing within its city limits, the ordinance is not preempted by virtue of the state's regulation of veterinary medicine through the VMPA or its implementing regulations.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *West Hollywood's Prohibition of Declawing Animals for Nontherapeutic Purposes*

On April 21, 2003 the City of West Hollywood, finding that onychectomy (declawing) and flexor tendonectomy procedures cause "unnecessary pain, anguish and permanent disability" to animals (West Hollywood Mun. Code, § 9.49.010, subd. (g)), adopted ordinance No. 03-656, adding chapter 9.49, entitled "Ban on Onychectomy (Declawing)" to the West Hollywood Municipal Code. The ordinance prohibits any person, "licensed

---

[2] Business and Professions Code section 460 provides, "No city or county shall prohibit a person, authorized by one of the agencies in the Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation, or profession or any portion thereof. Nothing in this section shall prohibit any city or county or city and county from levying a business license tax solely for revenue purposes nor any city or county from levying a license tax solely for the purpose of covering the cost of regulation."

Statutory references are to the Business and Professions Code unless otherwise indicated.

medical professional or otherwise," from performing or causing either procedure to be performed "by any means on any animal within the city, except when necessary for a therapeutic purpose." (West Hollywood Mun. Code, § 9.49.020.)[3]

In detailed findings supporting adoption of the ordinance, West Hollywood recited the bases for its conclusion the practice of animal declawing is cruel and inhumane unless necessary for a therapeutic purpose: "Contrary to most people's understanding, declawing consists of amputating not just the claws but the whole phalanx (up to the joint), including bones, ligaments, and tendons. [¶] . . . Declawing is not a simple cosmetic procedure akin to a manicure or a pedicure. On the contrary, to remove a claw, the bone, nerve, joint capsule, collateral ligaments, and the extensor and flexor tendons must all be amputated. Thus, declawing is not a 'simple,' single surgery but ten separate, painful amputations of the third phalanx up to the last joint of each toe. In human terms, this is akin to cutting off the last joint of each finger. [¶] . . . [¶] . . . Complications can include excruciating pain, damage to radial nerve, hemorrhage, bone chips that prevent healing, painful re-growth of deformed claw inside the paw which is not visible to the eye, necrosis, lameness, and chronic back and joint pain as shoulder, leg and back muscles weaken. . . ." (West Hollywood Mun. Code, § 9.49.010, subds. (a), (b) & (d).)[4]

### 2. *The Opinion from the DCA Legal Office*

Following adoption of West Hollywood's ban on declawing, the Veterinary Medical Board (Board), an agency within the DCA, asked the DCA's legal office whether the state's licensing law regulating the practice of veterinary medicine preempts West Hollywood's ordinance. In response the legal office issued its legal opinion No. 04-04, dated December 1, 2004, in the form of a memorandum to the executive officer of the Board, concluding the ordinance is preempted. In the view of the DCA legal office, under section 460 "a city

---

[3] "Therapeutic purpose" is defined as "the necessity to address the medical condition of the animal, such as an existing or recurring illness, infection, disease, injury or abnormal condition in the claw that compromises the animal's health. 'Therapeutic purpose' does not include cosmetic or aesthetic reasons or reasons of convenience in keeping or handling the animal." (West Hollywood Mun. Code, § 9.49.020.)

[4] West Hollywood's findings also cite a survey conducted by Forgotten Felines and Friends of Caddo Parrish in Louisiana, which found that approximately 70 percent of cats surrendered to the city shelter had been declawed, suggesting the belief that declawed cats are more "house-friendly" and, therefore, less likely to be abandoned is false. (West Hollywood Mun. Code, § 9.49.010, subd. (e).)

cannot prohibit a licensed veterinarian from practicing any aspect of the veterinary medical work that falls within the perimeter of the state license." In addition, the memorandum reasoned, "[r]egardless of whether or not the decision to declaw is based on a medical 'therapeutic purpose' or for reasons of 'aesthetics or convenience,' the procedure itself is a standard veterinary procedure. It cannot be regulated by local jurisdictions because it 'is of such a nature that the adverse effect of a local law on the transient citizens of the state outweighs the possible benefits to the municipality.' Such local regulation of veterinary practice in different jurisdictions would ultimately create a chaotic and confusing situation where it would be difficult for licensed veterinarians to know which veterinary procedures are legal or not depending on the jurisdiction. . . . Such a balkanization of professional practice ultimately would lead to different standards of practice throughout the state . . . [and] will inevitably make it very difficult for the Board to enforce the Veterinary Medical Practice Act."[5]

### 3. The CVMA Complaint for Declaratory and Injunctive Relief

As alleged in the complaint it filed to initiate this action, the CVMA, a nonprofit, statewide veterinary medical association with a membership of more than 4,800 veterinarians in the state, unsuccessfully attempted to persuade West Hollywood in early 2003 not to enact ordinance No. 03-656. After receipt of the December 1, 2004 opinion from the DCA's legal office, the CVMA requested, once again without success, that West Hollywood rescind the declawing ban and refrain from further enforcement of the ordinance. Having failed to win West Hollywood's voluntary acquiescence in its opposition to restrictions on licensed veterinarians' ability to perform nontherapeutic onychectomy and flexor tendonectomy procedures, on March 7, 2005 the CVMA filed a complaint for declaratory and permanent injunctive relief, alleging West Hollywood's ordinance is in conflict with, and preempted by, both section 460 and the VMPA.

West Hollywood demurred to the complaint, arguing ordinance No. 03-656 was not preempted by either section 460 or the VMPA as a matter of law and, therefore, the complaint failed to state a cause of action. In its opposition papers the CVMA disputed West Hollywood's legal arguments regarding preemption and also asserted the demurrer was predicated on a "contested

---

[5] The DCA legal office's memorandum also made the practical observation that West Hollywood's ordinance does not accomplish its stated purpose because "[o]wners may freely go to a neighboring city and have the operation performed there and bring the cat back into the city."

*factual* assumption—that declawing procedures constitute 'animal cruelty,' " an issue, the CVMA insisted, "that may not be properly decided on demurrer." The trial court apparently agreed: Citing to paragraph 17 of the complaint, which alleged that the banned declawing procedures are "a part of the veterinary profession," the court overruled the demurrer, finding the CVMA had stated causes of action for declaratory and injunctive relief on the ground the provision is preempted by section 460. The court declined to rule on the issue whether there was also preemption by virtue of the VMPA because such a ruling was unnecessary.

### 4. *Cross-motions for Summary Judgment and the Trial Court's Order*

After conducting initial discovery the CVMA and West Hollywood filed cross-motions for summary judgment. The CVMA no longer argued a factual finding whether onychectomy and flexor tendonectomy procedures are "cruel" when not performed for a medically necessary reason was necessary to determining the case, contending instead, "whether moral or immoral, ethical or unethical," these procedures are part of the practice of veterinary medicine as defined by the VMPA and, therefore, West Hollywood's effort to ban those procedures is preempted by the state's licensing laws. For its part, West Hollywood argued, as it had in its demurrer, it was entitled to judgment as a matter of law because neither section 460 nor the VMPA preempts its ordinance.

The trial court overruled West Hollywood's evidentiary objections to the declarations of several veterinarians submitted in support of CVMA's motion for summary judgment, which included the opinion that both onychectomy and flexor tendonectomy constitute surgical operations upon an animal, but sustained in part West Hollywood's objections to portions of the declaration of Dr. George B. Cuellar submitted in opposition to West Hollywood's motion, specifically Dr. Cuellar's opinions that, when performed in accordance with standard veterinary practices and procedures, "onychectomy and flexor tendonectomy are not 'cruel' "; the procedures are a "standard part of veterinary medical practice"; and, "if the procedures were 'cruel,' veterinary practitioners who carried out such procedures would be prosecuted under California Penal Code section 597 (prohibiting cruelty to animals)."

Following oral argument the trial court granted the CVMA's motion for summary judgment and denied West Hollywood's motion. Based on the declarations in support of CVMA's motion, the court ruled, as a matter of law, onychectomy and flexor tendonectomy "are indeed surgical procedures,

and therefore [West Hollywood] is not permitted to ban veterinarians from performing these procedures [under section 460], as it is clearly a part of their profession." Because it held the ordinance preempted by section 460, the court declined to rule on the issue of preemption under the VMPA "because such a ruling is not necessary." Judgment in favor of the CVMA was entered on December 16, 2005. West Hollywood was ordered to rescind ordinance No. 03-656, and it was prohibited from further enforcement of its ban on nontherapeutic declawing procedures.

## CONTENTIONS

West Hollywood contends the trial court erred in concluding its ordinance prohibiting any person from performing nontherapeutic declawing procedures is preempted by section 460. Although the trial court did not reach the question, West Hollywood also contends its ordinance is not preempted by the VMPA and its implementing regulations—an issue fully briefed by both parties in the trial court and once again on appeal. (See Code Civ. Proc., § 437c, subd. (m)(2) [conditions upon which reviewing court may affirm order granting summary judgment on ground not relied upon by trial court].)

## DISCUSSION

### 1. *Standard of Review*

We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296]; Code Civ. Proc., § 437c, subd. (c).) The proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we also review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *Lozada v. City and County of San Francisco* (2006) 145 Cal.App.4th 1139, 1149 [52 Cal.Rptr.3d 209].) Similarly, whether state law preempts a local ordinance is a pure question of law subject to de novo review. (*City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 882 [35 Cal.Rptr.3d 216]; *Roble Vista Associates v. Bacon* (2002) 97 Cal.App.4th 335, 339 [118 Cal.Rptr.2d 295].)

### 2. *State Regulation of the Practice of Veterinary Medicine*

The VMPA creates a Veterinary Medical Board within the DCA to exercise licensing, regulatory and disciplinary functions and to protect the public with

respect to the practice of veterinary medicine in California. (§§ 4800, 4800.1.) The Board is authorized to adopt rules and regulations as necessary to implement the Act. (§ 4808.) Regulations adopted by the Board are compiled in California Code of Regulations, title 16, sections 2000 to 2085.13.

■ Section 4826 defines the practice of veterinary medicine to include "[d]iagnos[ing] or prescrib[ing] a drug, medicine, appliance, application, or treatment of whatever nature for the prevention, cure or relief of a wound, fracture, bodily injury, or disease of animals" (§ 4826, subd. (b)); "[a]dminister[ing] a drug, medicine, appliance, application, or treatment of whatever nature for the prevention, cure, or relief of a wound, fracture, bodily injury, or disease of animals" (§ 4826, subd. (c)); and "[p]erform[ing] a surgical or dental operation upon an animal" (§ 4826, subd. (d)). Section 4825 makes it "unlawful for any person to practice veterinary medicine or any branch thereof in this state unless at the time of so doing, such person holds a valid, unexpired, and unrevoked license" as provided by the Act.

■ The VMPA and the regulations adopted by the Board contain comprehensive provisions setting minimum standards for sanitation and hygiene at sites where veterinary medicine is practiced (see, e.g., Cal. Code Regs., tit. 16, § 2032); and the Legislature has expressly preempted the field of enforcing the cleanliness and sanitary requirements of the Act. (§ 4809.6.) The VMPA and regulations also provide extensive rules governing the education, licensing and function of "registered veterinary technicians" (see §§ 4832, 4833, 4836; Cal. Code Regs., tit. 16, §§ 2060–2069), including a detailed specification of animal health care tasks that may and may not be performed by technicians and unregistered assistants. (§ 4840.2; Cal. Code Regs., tit. 16, §§ 2036, 2036.5.)

The regulations state, as the required "minimum standard of practice" of veterinary medicine, "The delivery of veterinary care shall be provided in a competent and humane manner. All aspects of veterinary medicine shall be performed in a manner consistent with current veterinary medical practice in this state." (Cal. Code Regs., tit. 16, § 2032; see § 4883, subd. (m) [Board may revoke or suspend license or assess fine for unprofessional conduct, specifically including cruelty to animals].) Other than this general hortatory statement, neither the Act itself nor any of its implementing regulations purports to specify the manner in which a veterinarian must practice his or her profession; and, unlike enforcement of the Act's provisions regulating sanitation and hygiene of the offices where veterinary medicine is practiced,

the Legislature has not expressly stated its intention to completely occupy the field or preempt local legislation that may incidentally restrict certain veterinary medical procedures.

### 3. *General Principles of Preemption*

■ The California Constitution reserves to a county or city the right to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7; see *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534] (*Sherwin-Williams*).)[6] " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' " (*Sherwin-Williams*, at p. 897; see *Roble Vista Associates v. Bacon, supra*, 97 Cal.App.4th at p. 339.) A prohibited conflict exists if the local ordinance duplicates or contradicts general law or "enters an area either expressly or impliedly fully occupied by general law." (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1251 [23 Cal.Rptr.3d 453, 104 P.3d 813] (*American Financial Services*); see *Sherwin-Williams*, at pp. 897–898.)

■ " '[I]t is well settled that local regulation is invalid if it attempts to impose additional requirements in a field which is fully occupied by statute.' [Citation.] '[L]ocal legislation enters an area that is "fully occupied" by general law when the Legislature has expressly manifested its intent to "fully occupy" the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the" locality [citations].' (*Sherwin-Williams, supra*, 4 Cal.4th at p. 898.)" (*American Financial Services, supra*, 34 Cal.4th at p. 1252.)

Local ordinances within the scope of a city's traditional police powers are presumed valid: The party challenging the ordinance has the burden of

---

[6] Under article XI, section 5, subdivision (a), of the California Constitution, a charter city has exclusive power to legislate with respect to "municipal affairs" and, as to those matters, is exempt from the "conflict with general laws" restrictions of article XI, section 7 of the Constitution. (*Sherwin-Williams, supra*, 4 Cal.4th at p. 897, fn. 1; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 704 [209 Cal.Rptr. 682, 693 P.2d 261].) Because West Hollywood is not a charter city, however, there is no need in this case to decide whether its anti-declawing ordinance can be characterized as a "municipal affair" within the meaning of the constitutional provision.

demonstrating preemption. (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149 [45 Cal.Rptr.3d 21, 136 P.3d 821]; *Horton v. City of Oakland* (2000) 82 Cal.App.4th 580, 584 [98 Cal.Rptr.2d 371].) Before invalidating a local ordinance as preempted, a court must "carefully insur[e] that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16–17 [283 Cal.Rptr. 569, 812 P.2d 916]; see *Horton*, at p. 585.)

### 4. *Section 460 Does Not Preempt the West Hollywood Anti-declawing Ordinance*

As discussed, the trial court found that onychectomy and flexor tendonectomy are surgical operations upon an animal and that performing such procedures are part of the practice of veterinary medicine. Accordingly, the court concluded West Hollywood's prohibition of those procedures by any person, including licensed veterinarians, was precluded by section 460, which provides, "No city or county shall prohibit a person, authorized by one of the agencies in the Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation, or profession or any portion thereof."[7]

The DCA's legal office had reached a similar conclusion, "Both an 'onychectomy' (declawing) and 'flexor tendonectomy' are common surgical procedures employed by veterinarians upon felines and the practice of this veterinary surgical procedure is restricted to appropriately licensed persons. Our reading of Business and Professions Code section 460 is that a city cannot prohibit a licensed veterinarian from practicing any aspect of veterinary medical work that falls within the perimeter of the state license."

West Hollywood advances three arguments in support of its contention the trial court erred in concluding section 460 bars adoption of its anti-declawing ordinance. First, because nontherapeutic declawing procedures are inhumane and, by definition, serve no legitimate medical purpose, performing such procedures is not a "portion" of the practice of veterinary medicine. Second, because the ordinance is an anticruelty measure and is not directed solely to veterinarians, but to any person who authorizes or performs such procedures, including the owner of the animal, it is outside the scope of section 460, even as that statute was interpreted by the DCA's legal office and by the trial court. Finally, by its terms section 460 prohibits local governments from imposing

---

[7] The second sentence of section 460 provides, "Nothing in this section shall prohibit any city or county or city and county from levying a business license tax solely for revenue purposes nor any city or county from levying a license tax solely for the purpose of covering the cost of regulation."

additional licensing conditions or qualification as a requirement for working within their jurisdiction but does not preclude local regulation of the manner in which state licensees actually perform their business or profession. Although the first two contentions lack merit, we agree the trial court (and the DCA's legal office) misconstrued the scope of section 460 and thus erred in concluding that statute expressly preempts West Hollywood's anti-declawing ordinance.

### a. Onychectomy and flexor tendonectomy are currently part of the practice of veterinary medicine

West Hollywood and its amici curiae initially argue section 4826, subdivision (d)'s definition of the practice of veterinary medicine to include performing a surgical operation upon an animal does not encompass nontherapeutic declawing procedures because "surgery" is "the treatment of disease, injury, or deformity by manual or instrumental operations," quoting Webster's New Universal Unabridged Dictionary, as well as citing to similar definitions from a variety of standard, legal and medical dictionaries. Yet in the findings supporting adoption of ordinance No. 03-656 West Hollywood itself recognized "onychectomy, or 'declawing,'" as "a commonly performed surgical procedure." (West Hollywood Mun. Code, § 9.49.010, subd. (a).) Similarly, Penal Code section 597.6,[8] which prohibits the nontherapeutic declawing of exotic or native wild cats and upon which West Hollywood relies to bolster its argument that declawing animals is cruel and inhumane, defines "declawing" and "onychectomy" as a "surgical procedure." Moreover, although counsel for West Hollywood insisted to the contrary at oral argument, without question an individual not licensed as a veterinarian who nonetheless performed declawing procedures, whether therapeutic or nontherapeutic, would be guilty of engaging in the practice of veterinary medicine without a license unless he or she was the owner of the animal or one of the owner's employees (§ 4827, subd. (a)) or fell within one of the other exceptions to the Act's licensing requirements (§ 4830).

West Hollywood also asserts, in somewhat circular fashion, because the Act and implementing administrative regulations identify animal cruelty as

---

[8] Penal Code section 597.6, subdivision (a)(1), provides, "No person may perform, or otherwise procure or arrange for the performance of, surgical claw removal, declawing, onychectomy, or tendonectomy on any cat that is a member of an exotic or native wild cat species, and shall not otherwise alter such a cat's toes, claws, or paws to prevent the normal function of the cat's toes, claws, or paws." Penal Code section 597.6, subdivision (a)(2), provides the prohibition does not apply to a procedure performed solely for a therapeutic purpose. Assembly Bill No. 1857 (2003–2004 Reg. Sess.), which added section 597.6 to the Penal Code, was introduced by Assemblymember Paul Koretz, whose district included West Hollywood, in February 2004, nearly one year after West Hollywood adopted its anti-declawing ordinance. The bill was approved by the Legislature in August 2004 and signed by the Governor on September 29, 2004. (Stats. 2004, ch. 876, § 1.)

unprofessional conduct (§ 4883, subd. (m)) and require veterinarians to provide care in a "competent and humane manner" (Cal. Code Regs., tit. 16, § 2032), West Hollywood's determination nontherapeutic declawing is cruel and inhumane means performing those procedures is not part of the practice of veterinary medicine. The DCA legal office, on the other hand, in its opinion concluding the West Hollywood ordinance was preempted by state law, like the CVMA and the veterinarians whose declarations it submitted to the trial court in support of its motion for summary judgment, maintains nontherapeutic declawing "is a standard veterinary procedure": "[S]urgical declawing is often necessary because of a severe medical or behavioral condition and has often been used as an alternative to abandonment or euthanasia."

We need not enter, let alone attempt to resolve, the debate whether nontherapeutic declawing is "cruel" or can ever be justified as a moral or ethical matter; for it is clear that at present it is part of the conventional practice of veterinary medicine, at least in the United States.[9] Were it not, there would be little need for the West Hollywood ordinance in the first place.[10] Nonetheless, the question remains whether section 460 prohibits a local government from making such political judgments when they restrict in some manner the traditional method by which a state licensee conducts his or her business or profession.

    b.   *The ordinance's general language banning nontherapeutic declawing procedures performed by any person, "licensed professional or otherwise," does not eliminate the potential conflict with section 460*

Drafted as a measure to prevent animal cruelty, West Hollywood's anti-declawing ordinance prohibits any person, not only licensed veterinarians,

---

[9] Similarly, although we may decry unnecessarily combative and overly aggressive litigation tactics as "unprofessional" and approve the imposition of sanctions to deter such behavior (see, e.g., *Safeco Ins. Co. of America v. Parks* (2004) 122 Cal.App.4th 779, 795 [19 Cal.Rptr.3d 17]), the lawyers who engage in this conduct are surely practicing law.

[10] On February 14, 2003, several months prior to West Hollywood's adoption of ordinance No. 03-656 and a full year before he introduced Assembly Bill No. 1857 (2003–2004 Reg. Sess.), Assemblymember Koretz introduced Assembly Bill No. 395 (2003–2004 Reg. Sess.), which would have amended the Act by adding section 4826.5 to the Business and Professions Code to prohibit veterinary licensees from performing nontherapeutic surgical claw removal procedures on any cat. The bill was subsequently amended to limit its prohibition to nontherapeutic procedures performed on native, wild or exotic cats (Assem. Bill No. 395, as amended Jan. 5, 2004) and eventually died when it was not passed by the Assembly by January 31, 2004. (See Cal. Const., art. IV, § 10, subd. (c).) This initial attempt by Assemblymember Koretz to prohibit nontherapeutic declawing by licensed veterinarians, rather than his ultimately successful effort to add the prohibition as it relates to wild or exotic cats to the portion of the Penal Code dealing with animal cruelty, underscores the fact that at present the procedure is widely considered an acceptable part of the practice of veterinary medicine.

from performing onychectomy and flexor tendonectomy procedures for non-therapeutic purposes. (See *San Diego County Veterinary Medical Assn. v. County of San Diego* (2004) 116 Cal.App.4th 1129, 1135 [10 Cal.Rptr.3d 885] ["county has expansive constitutional police power authority to act in the public interest in regulating domestic animal populations"].) Because the ordinance is not intended to regulate the practice of veterinary medicine, West Hollywood argues it cannot conflict with section 460, even as that section was interpreted by the trial court to proscribe local legislation that prohibits a licensed veterinarian from engaging in any portion of his or her profession. As discussed below, we agree that, in analyzing whether the ordinance is preempted by the Act, it is significant the anti-declawing ordinance is a general animal cruelty measure that applies, for example, to breeders and other animal owners and their employees, who are not required to be licensed as veterinarians to perform surgical procedures on their animals (§ 4827, subd. (a)). However, were we to agree with the CVMA's and the trial court's broad construction of section 460, we would similarly agree it is not only the stated purpose but also the direct, practical effect of the local legislation that determines its validity. (See, e.g., *Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 541 [86 Cal.Rptr. 673, 469 P.2d 353] [although chartered city's ordinance by title and purpose appears limited to municipal affairs, because it has "substantial direct effect" upon matter of statewide concern, its validity must be assessed by determining if field it regulates is preempted by state laws].)

    c.  *Section 460 prohibits local licensing requirements and qualifications but does not preclude otherwise valid local regulation of the manner in which a business is operated or profession is practiced*

█ Section 460 forbids a city or county from prohibiting, in whole or in part, any person licensed or certified by one of the agencies within the DCA from engaging in his or her business or profession. The trial court, accepting the argument proffered by the CVMA and the DCA's legal office, interpreted this prohibition to include not only local legislation imposing separate and additional licensing requirements or other qualifications on individual licensees (for example, a local ordinance requiring state-licensed acupuncturists to pass an additional examination before operating a business within the city's limits) but also regulations affecting the manner in which the licensed profession itself is practiced (for example, a local ordinance prohibiting the reuse of needles by acupuncturists).[11] This expansive interpretation of section

---

[11] The acupuncture example is provided only to illustrate the statutory construction issue involving section 460 in a context different from the practice of veterinary medicine and is not intended to suggest whether such a hypothetical ordinance would be preempted by the Acupuncture Licensure Act (§ 4925 et seq.).

460 misconstrues the literal language of the statute itself and misperceives the policy it was intended to implement.

In *Maloy v. Municipal Court* (1968) 266 Cal.App.2d 414, 418 [72 Cal.Rptr. 207], Division Three of this court explained that section 460, which had been enacted only a year earlier, "declares a policy of preemption by the state of the licensing of all businesses, occupations and professions licensed by the State Department of Professional and Vocational Standards [now DCA] except local licensing for revenue purposes and to cover the costs of regulation." (See generally *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 107, fn. 5 [223 Cal.Rptr. 609] ["it is well established that where the state has provided a comprehensive scheme for examining and licensing members of a trade or profession, municipalities may not impose additional qualifications before issuing licenses to exercise the trade or profession within the city"]; *Horwith v. City of Fresno* (1946) 74 Cal.App.2d 443, 448–449 [168 P.2d 767] [electrical contractor's privilege to do business at any place within state, conferred by state-issued license, cannot be circumscribed by city ordinance requiring local business license available only after contractor passes examination before city's electrical board of examiners; however, "[t]his does not limit the right of local governmental agencies to protect property and life through the enforcement of local regulations as to the quality and character of the installations"].)

This intent to preempt the field of licensing occupied by the agencies of the DCA, but not to prohibit otherwise valid local regulation of the manner in which licensed businesses and professions are operated, is evident in the language of section 460 itself. The first sentence of section 460 is directed solely to local legislation that purports to prohibit *individuals* from engaging in a licensed occupation, not to regulation of the occupation itself. The second sentence of section 460 expressly authorizes the collection of a business license tax by cities and counties "for the purpose of covering the cost of regulation," plainly anticipating (and thus permitting) local regulation of state-licensed businesses. (See *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150] [preemption generally "should not be found when the statutory scheme recognizes local regulations"]; see generally *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858] [in resolving questions of statutory interpretation, the court "must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question"; the first step " ' "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning." ' "]; *People v. Farell* (2002) 28 Cal.4th 381, 386 [121 Cal.Rptr.2d 603, 48 P.3d 1155] [best indication of legislative intent appears in the language of the enactment].)

Any doubt about the plain meaning of the statute is resolved by the concededly meager legislative history of the section. In recommending that Governor Reagan sign Assembly Bill No. 2310 (1967–1968 Reg. Sess.) as amended June 27, 1967, which added section 460 to the Business and Professions Code, the Department of Professional and Vocational Standards explained the bill was a response to "attempts by city or cities in author's district to require accountants and architects to meet local requirements as condition of engaging in certain types of work authorized by their State licenses" and described the apparent effect of the legislation is "to permit continuation of local licensing for revenue purposes and the imposition of license taxes necessary to cover otherwise permissible local regulation, but to prohibit adoption or enforcement of ordinances which require compliance therewith as a condition of engaging in a business, occupation, or profession for which a license from an agency in this department is required." (Mem. to Governor Ronald Reagan from Dept. of Prof. & Vocational Stds., Aug. 1, 1967, p. 1; see also 73 Ops.Cal.Atty.Gen. 28, 40 (1990) [language in Contractors State License Law prohibiting city or county from enacting regulations relating to the qualifications necessary to engage in the business of contracting "reiterates the prohibition of section 460 quoted above with respect to those licensed by the Contractors State License Board"].)[12]

*Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074 [44 Cal.Rptr.2d 472], upon which the CVMA relies to support its interpretation of section 460, is not to the contrary. The issue in *Stacy & Witbeck, Inc.* was whether San Francisco could bar a state-licensed contractor from bidding on the city's public works projects for a specified period based on a determination the contractor had knowingly filed a false claim with the city. Among the grounds asserted by the contractor for overturning the ban was that it contradicted section 460 because, by barring it from entering into public contracts with the city, it prohibited it from engaging in "a portion of" its business. (*Stacy & Witbeck, Inc.*, at p. 1095.) Relying on the 1990 opinion from the Attorney General cited in the preceding paragraph, the Court of Appeal held section 460 would preclude a city from "prevent[ing] a contractor from practicing his or her profession with respect

---

[12] Section 460 is part of chapter 7 of division 1, "Licensee," of the Business and Professions Code. The other two statutory provisions in this chapter, sections 461 and 462, are limited to issues relating to administration of state and local licensing systems. Section 461 prohibits state and local public agencies from requiring a license applicant to reveal an arrest that did not result in a conviction or plea of no contest; and section 462 requires the creation of a system for an inactive category of licensure in each of the DCA's boards and bureaus. The narrow scope of chapter 7 reinforces our conclusion section 460 preempts only local licensing requirements and qualifications. (See *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226] [statute must be construed in context of entire statutory scheme]; *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760] [same].)

to third parties"—that is, the city could not "suspend, revoke or otherwise affect Stacy's license or curtail the geographic area within which Stacy could seek to work." (*Stacy & Witbeck, Inc.*, at p. 1095.) "However, when the local entity acts to protect its public purse solely by refusing, on its own behalf, to continue doing business with an irresponsible contractor for up to five years, Business and Professions Code section 460 would not apply." (*Stacy & Witbeck, Inc.*, at p. 1095.) Thus both the permitted limitation (no public contracts with the City and County of San Francisco itself for five years) and those that would have been proscribed by section 460 (suspension or revocation of the contractor's right to do any contracting work in San Francisco) involved the validity of additional, local qualifications necessary to engage in a state-licensed business activity, not efforts by San Francisco to regulate the manner in which contractors operated within the city limits.

Indeed, in support of its decision the court in *Stacy & Witbeck, Inc.* cited and distinguished *City and County of San Francisco v. Boss* (1948) 83 Cal.App.2d 445, 451–452 [189 P.2d 32], a case in which the court had invalidated a local ordinance that limited a state-licensed contractor's right to contract in San Francisco unless he or she obtained a separate city license, which could be canceled (thus precluding work in the city) for violations of local law that did not affect the validity of the contractor's state license. (See *Stacy & Witbeck, Inc. v. City and County of San Francisco, supra*, 36 Cal.App.4th at p. 1095, fn. 10.) Consistent with our interpretation of section 460, the court in *Boss* made plain that state preemption of licensing activity does not limit the right of local governments to exercise their police powers to ensure "the quality and character" of the licensees' work. (*Boss*, at p. 450.) That is simply what West Hollywood has done with ordinance No. 03-656.

### d. *The DCA legal opinion is not entitled to heightened deference*

Finally, the contrary view of the scope of section 460 offered by the DCA's legal office in its opinion to the Board does not mandate a different result. In *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*) the Supreme Court distinguished the level of judicial deference to be accorded an agency's quasi-legislative acts, in which the agency exercises its delegated lawmaking power, from interpretive acts, in which the agency gives its view of the meaning or legal effect of a statute or regulation, "questions lying within the constitutional domain of the courts." (*Id.* at p. 11.) Although courts are bound by an agency's rulemaking as long as it is authorized by the enabling legislation, "the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7; see *Diablo Valley College Faculty Senate v. Contra*

*Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1034–1036 [56 Cal.Rptr.3d 294].) "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative." (*Yamaha,* at pp. 7–8.)

██ Neither the context nor the circumstances of the DCA's legal opinion weigh in favor of according its broad interpretation of section 460 any heightened deference in this case. An agency has a potential interpretive advantage over the courts if it has developed a specialized expertise, " 'especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Yamaha, supra,* 19 Cal.4th at p. 12.) Although section 460 protects the exclusive right of boards and bureaus within the DCA to issue licenses and certificates, the language of the statute is neither technical nor complex. Without in any way discounting the agency's expertise in specialized regulatory matters, therefore, it enjoys no comparative advantage over a generalist court in interpreting the legal text at issue. (See *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1215 [103 Cal.Rptr.2d 75].)

Similarly absent in this case are factors suggesting the agency's interpretation is " 'probably correct' " (*Yamaha, supra,* 19 Cal.4th at p. 12), in particular indications that the interpretation was carefully considered by senior agency officials or evidence the agency has consistently maintained its interpretation, especially over a long period of time. (*Id.* at pp. 12–13; *Spanish Speaking Citizens' Foundation, Inc. v. Low, supra,* 85 Cal.App.4th at p. 1215.) Although a legal opinion on the preemption issue was requested by the Board following West Hollywood's adoption of ordinance No. 03-656, nothing in the record indicates the Board itself ever approved the views expressed by the DCA's legal office regarding the scope of section 460. Moreover, far from representing a consistent view of the statute, as discussed above, when section 460 was initially passed by the Legislature and was awaiting signature by the Governor, the Department of Professional and Vocational Standards—the DCA's predecessor agency—described the intended scope of section 460 as limited to restricting efforts by cities and counties to require individuals to meet local requirements as a condition of engaging in types of work authorized by their state licenses. That contemporaneous agency construction of section 460 is entitled to far greater weight than the recent legal opinion issued in response to West Hollywood's decision to prohibit nontherapeutic declawing procedures within its city limits. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379,

1388 [241 Cal.Rptr. 67, 743 P.2d 1323] ["contemporaneous construction of a new enactment by the administrative agency charged with its enforcement, although not controlling, is entitled to great weight"]; see *Ocean Park Associates v. Santa Monica Rent Control Bd.* (2004) 114 Cal.App.4th 1050, 1068–1069 [8 Cal.Rptr.3d 421] [although deference should normally be accorded agency's contemporaneous interpretation of new enactment, "there is little reason for a court to defer" to agency's interpretation of governing statute 20 years after enactment].)

### 5. *The Veterinary Medicine Practice Act Does Not Preempt the West Hollywood Anti-declawing Ordinance*

■ As discussed above, performing onychectomies and flexor tendonectomies, whether or not necessary for therapeutic purposes, is currently part of the practice of veterinary medicine. Nonetheless, neither the VMPA nor the regulations adopted by the Board mandate or expressly approve those procedures. Accordingly, West Hollywood's ordinance No. 03-656 does not directly conflict with or contradict the VMPA. (*Sherwin-Williams, supra*, 4 Cal.4th at p. 902 [local legislation not contradictory or inimical to statute because "ordinance does not prohibit what the statute commands or command what it prohibits"]; *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 866 [118 Cal.Rptr.2d 746, 44 P.3d 120] [no direct conflict between ordinance and statute because ordinance "does not mandate what state law expressly forbids, nor does it forbid what state law expressly mandates"].) Similarly, because the VMPA and related regulations do not prohibit nontherapeutic declawing procedures, West Hollywood's ordinance is not coextensive with, and plainly does not duplicate, state law. (*American Financial Services, supra*, 34 Cal.4th at p. 1251; *Sherwin-Williams*, at pp. 897–898; *In re Portnoy* (1942) 21 Cal.2d 237, 240 [131 P.2d 1] ["[i]nsofar as the provisions of Ordinance No. 248 purport to prohibit acts which already are made criminal by the Penal Code, it is clear that they exceed the proper limits of supplementary regulation and must be held invalid because in conflict with the statutes which they duplicate"].) Finally, although the VMPA specifically preempts enforcement of sanitation and hygiene requirements developed for the premises where veterinarians practice (§ 4809.6),[13] the Legislature has not expressly declared its intention to fully occupy the field of regulating the practice of veterinary medicine. (See *Great Western Shows, Inc.*, at pp. 864–865 [notwithstanding Legislature's enactment of several statutes pertaining to regulation of gun shows, no express preemption of additional local regulation of gun shows].)

---

[13] Section 4809.6 provides, "The enforcement of Sections 4809.5 [relating to inspection of premises] and 4854 [authorizing the Board to establish minimum standards for cleanliness and sanitation] of this chapter is a function exclusively reserved to the Veterinary Medical Board and the state has preempted and occupied this field of enforcing the cleanliness and sanitary requirements of this chapter."

Although local regulation of veterinarians is not expressly preempted by the VMPA, the CVMA contends the practice of veterinary medicine is highly regulated by the state and thus the West Hollywood ordinance is preempted by "legislative implication" because it impermissibly enters an area fully and completely occupied by general law. (E.g., *American Financial Services, supra*, 34 Cal.4th at p. 1252 [local regulation is invalid if it attempts to impose additional requirements in a field fully occupied by statute]; *Sherwin-Williams, supra*, 4 Cal.4th at p. 898 [area fully occupied by general law when Legislature has expressly stated its intent to fully occupy area or when it has impliedly done so by so completely regulating area as to indicate it is exclusively matter of state concern, by partially occupying area in terms clearly indicating a paramount state concern that will not tolerate additional local action or when partially covered area involves subject matter of such a nature that adverse effect of local ordinance on transient citizens of the state outweighs possible benefit of local regulation].) In advancing this argument the CVMA misconstrues the nature of West Hollywood's anti-declawing ordinance and, as a result, misapprehends the scope of the implied preemption doctrine.

Initially, although section 4826 broadly defines what constitutes the practice of veterinary medicine, it is by no means clear the VMPA fully occupies the field of regulating that practice. Of course, the fact the state has legislated on the same subject does not necessarily preclude the exercise of local authority: A city or county may make additional regulations, different from those established by the state, if not inconsistent with the purpose of the general law. (See *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 704–709 [209 Cal.Rptr. 682, 693 P.2d 261]; *Northern Cal. Psychiatric Society v. City of Berkeley, supra*, 178 Cal.App.3d at p. 106.) Unlike the comprehensive state regulatory scheme governing the availability and administration of psychiatric care and services, for example, which includes not only the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.), but also numerous other state statutes, and thus "manifest[s] a clear legislative intent to occupy the field of psychiatric care, treatment, services and facilities in general" (*Northern Cal. Psychiatric Society*, at p. 108 [local ordinance prohibiting administration of electric shock treatment within city limits preempted by state law]), the only standard of practice set by the VMPA is the minimal requirement that "[t]he delivery of veterinary care shall be provided in a competent and humane manner" and "performed in a manner consistent with current veterinary medical practice in this state." (Cal. Code Regs., tit. 16, § 2032.) Those commendable objectives hardly constitute the type of extensive regulation of the practice of veterinarian medicine that would support an inference the subject has become either exclusively a matter of state concern or one in

which the state interest is so paramount it will not tolerate additional local action. (See *Great Western Shows, Inc. v. County of Los Angeles, supra*, 27 Cal.4th at p. 866 ["we are reluctant to find such a paramount state concern, and therefore implied preemption, 'when there is a significant local interest to be served that may differ from one locality to another' "]; see also *Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45, 51–52 [122 Cal.Rptr. 361] [general statutory grant of authority to state college board of trustees to govern state colleges and regulations adopted pursuant to that authority did not preempt city ordinance setting standards for treatment of circus animals performing on state college property].)

In addition, as previously discussed, the VMPA and the regulations adopted by the Board contain comprehensive provisions setting minimum standards for sanitation and hygiene at sites where veterinary medicine is practiced; and the Legislature has explicitly provided enforcement of the cleanliness and sanitary requirements of the Act and implementing regulations are exclusively matters for the state. (§ 4809.6.) This express preemption of local regulation or enforcement of hygiene standards and the absence of any comparable legislative statement of preemption regarding regulation of the practice of veterinarian medicine itself are convincing evidence of the compatibility of ordinance No. 03-656 with state law. (See, e.g., *Big Creek Lumber Co. v. County of Santa Cruz, supra*, 38 Cal.4th at p. 1157 ["[b]y expressly preempting local regulations targeting the conduct of timber operations, [the statute] implicitly permits local regulations addressed to other aspects of timber operations"]; *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 95 [2 Cal.Rptr.2d 513, 820 P.2d 1023] [Legislature's "preemptive action in specific and expressly limited areas weighs against an inference that preemption by implication was intended elsewhere"].)

As for the third test for implied preemption—" 'the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality" (*Sherwin-Williams, supra*, 4 Cal.4th at p. 898)— because onychectomies and flexor tendonectomies performed for nontherapeutic reasons are, by their very definition, nonemergency procedures, any negative impact on transient citizens is difficult to imagine. As noted in the opinion from the DCA's legal office, owners may freely go to a neighboring city and have the operation performed there and bring the cat back to West Hollywood. Although the CVMA asserts local regulation of veterinary practice could ultimately result in a chaotic situation in which licensed veterinarians struggle to know what procedures are legal in which jurisdictions, this

speculative fear of "fragmented localization" is, in our view, wholly insufficient to overcome West Hollywood's significant interest in exercising its police power to set minimum standards for the humane treatment of animals within its borders.[14]

In sum, far from a comprehensive scheme to control all matters related to the practice of veterinary medicine, as the CVMA contends, the purpose and scope of the VMPA appears to be regulate the education, licensing and discipline of veterinarians and registered veterinary technicians; to establish and enforce sanitary standards for the premises at which veterinary medicine is practiced; and to prohibit the unauthorized practice of veterinary medicine by unlicensed individuals. The Legislature has no doubt preempted discrete areas impacting the practice of veterinary medicine (most clearly licensing and enforcement of sanitary standards),[15] but not the entire field. (See *California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1317 [78 Cal.Rptr.2d 591] ["implied preemption can properly be found only when the circumstances 'clearly indicate' a legislative intent to preempt"]; see also *Great Western Shows, Inc. v. County of Los Angeles, supra,* 27 Cal.4th at p. 861 ["review of the gun law preemption cases indicates that the Legislature has preempted discrete areas of gun regulation rather than the entire field of gun control"].)

Even if we were to find the VMPA fully occupies the field of regulating veterinary medicine, that conclusion would not be determinative of the validity of ordinance No. 03-656. By its terms, the ordinance is a general measure to prevent animal cruelty—an area concededly not preempted by the

---

[14] The DCA's legal office in its opinion to the Board also expressed concern about a "balkanization of professional practice [that] ultimately would lead to different standards of practice throughout the state," making it far more difficult for the Board to enforce the Act. For the reasons discussed in part 4.d., *ante,* although we have given serious consideration to the practical enforcement concerns articulated by the DCA's legal office, its opinion on the legal question of preemption is not entitled to any special deference. (See *Yamaha, supra,* 19 Cal.4th at p. 12.)

[15] The Attorney General's 1963 opinion that the City of Los Angeles cannot require either a permit for the operation of a veterinary hospital by a licensed veterinarian or a kennel license for keeping nonpatient animals on a veterinarian's premises (41 Ops.Cal.Atty.Gen. 125 (1963)) illustrates this limited preemption: The Attorney General concluded the city lacked authority to impose the permit requirement not because regulating the practice of veterinary medicine has been entirely preempted, but because "the field of regulation of the premises and establishment of a veterinarian has fully been occupied by state law." (*Id.* at p. 128.) "[I]f the boarding takes place on the premises or within the establishment of a licensed veterinarian, which location is by general state law regulated by the code, an invalid conflict exists since the entire premises or establishment is subject to state regulation, including that part thereof which is utilized for nonveterinary-medical purposes." (*Ibid.*)

state[16]—not a regulation of the practice of veterinary medicine. To be sure, one effect of the ordinance is to prevent veterinarians in West Hollywood from performing declawing procedures unless medically necessary; but the ordinance also prohibits animal owners and their employees (breeders, for example) from performing the procedures, which they otherwise might do even though not licensed as a veterinarian (§ 4827, subd. (a)), and makes it a criminal offense for the owner ("the animal guardian") to order the procedure.[17]

A closely analogous issue was considered in *People v. Mueller* (1970) 8 Cal.App.3d 949 [88 Cal.Rptr. 157] (*Mueller*), in which the court reviewed an ordinance enacted by the City of Redondo Beach prohibiting the use of "chumming," the practice of throwing dead fish into the water without hooks as bait to attract fish, in a harbor within its city limits. Commercial fishermen challenged the ordinance on preemption grounds as an invalid limitation on methods of fishing. The court agreed the state had preempted the regulation of fishing in the state. However, because the purpose and scope of the Redondo Beach ordinance was the prevention of water pollution within city limits, the court found the effect on fishing to be "incidental" to the principal purpose of the legislation. "Preemption by the state of an area of the law does not preclude local legislation enacted for the public safety which only incidentally affects the preempted area." (*Mueller*, p. 954; see 70 Ops.Cal.Atty.Gen. 210 (1987) [although state has preempted regulation of hunting, county ordinance banning use of steel-jawed leghold traps is valid where primary purpose of local enactment is protection of public safety, notwithstanding secondary effect on hunting].)

The appellants in *Mueller* were licensed commercial fishermen who had violated the Redondo Beach ordinance by "chumming" at an area within King Harbor primarily used by the commercial fishing industry. (*Mueller, supra*, 8 Cal.App.3d at p. 951.) On each of the two nights in question, the men caught an average of 1,600 pounds of mackerel. (*Ibid.*) The court's use of the term "incidental" in this context was not a quantitative assessment of the impact of the ordinance on commercial fishing activity within Redondo Beach but rather an evaluation of the city's purpose in adopting the ban. "The effect of the challenged [provision] upon fishing is incidental to the principal

---

[16] Responding to an argument in West Hollywood's opening brief, the CVMA acknowledges a provision of the San Francisco Municipal Code that sets minimum standards for the humane treatment of companion dogs is valid even if applied to a veterinarian who fails to adequately provide for a dog in his or her care.

[17] At oral argument counsel for the CVMA conceded West Hollywood could adopt an ordinance that prohibited animal owners from performing and from requesting that a veterinarian perform a onychectomy or flexor tendonectomy for nontherapeutic purposes, provided the law adequately immunized the licensed veterinarian from criminal prosecution for performing one of the banned procedures.

purpose of the legislation, the prevention of pollution. Coverage of the field of regulation of fishing by the state Fish and Game Code, thus, does not invalidate the local ordinance." (*Id.* at p. 954.)

■ Like the ordinance in *Mueller, supra,* 8 Cal.App.3d 949, West Hollywood's ordinance prohibiting onychectomy and flexor tendonectomy procedures has a valid principal purpose plainly within the city's police power—the prevention of animal cruelty—and only a secondary or incidental effect on a field arguably preempted by the state. Because this incidental restriction of a particular form of surgical procedure to therapeutic purposes does not materially interfere with any legislative purpose expressed in the VMPA, West Hollywood's ordinance is not preempted by state law.

## DISPOSITION

The judgment is reversed. The trial court is directed on remand to enter a new order denying the California Veterinary Medical Association's motion for summary judgment and granting the motion for summary judgment filed by the City of West Hollywood and to conduct further proceedings not inconsistent with this opinion. The City of West Hollywood is to recover its costs on appeal.

Johnson, J., concurred.

**WOODS, J.,** Dissenting.—I respectfully dissent. If I were in the majority I would hold that the trial court did not err in finding the City of West Hollywood ordinance enacted into law on April 21, 2003, preempted by State of California legislation and therefore invalid under the California Constitution.

An analysis of the preemption question should begin with an examination of any expression by the California Supreme Court on the issues being examined. Fortunately, we do have a decision by the California Supreme Court for our guidance in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916]. The decision of our high court gives an indepth analysis of the "home rule" provision of the California Constitution as it pertains to "municipal" vis à vis "statewide" concerns. For this reason *California Federal* is quoted extensively hereafter. In summary, the decision involved a refund of taxes claim by the plaintiff on the ground that the defendant City of Los Angeles tax statute was a question of "statewide" concern and not a municipal affair thereby invoking state preemption entitling plaintiff to a refund of any local taxes paid. The trial court ruled in favor of the plaintiff association finding that California Constitution, article XI, section 5, subdivision (a) (municipal home rule for

charter cities) was not a bar to plaintiff's recovery because the claim was a matter of "statewide concern" and held in favor of plaintiff. The case was reversed by the Court of Appeal, which was in turn reversed by our high court resulting in reinstatement of the decision of the trial court.

Our high court stated that it granted review to decipher the meaning of the "municipal affairs" clause, albeit within the context of conflicting claims of the Legislature and a charter city to levy taxes on a financial corporation. I find the decision strongly applicable to the facts of this case regardless of the obvious distinguishing feature that the subject matter of the decision dealt with a provision of the Revenue and Taxation Code and of lesser import the fact that the City of West Hollywood is not a charter city. In footnote 1 of its opinion the Supreme Court repeats the content of the "home rule" provision as follows:

" 'It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.' " (*California Fed. Savings & Loan Assn. v. City of Los Angeles, supra,* 54 Cal.3d at p. 6, fn. 1.) I note that the provision makes no reference to subject matter and by implication applies to any ordinance whether involving taxes, veterinarian medicine or any other endeavor sought to be locally regulated.

At pages 16 through 18, the court in *California Fed. Savings & Loan Assn. v. City of Los Angeles, supra,* 54 Cal.3d 1, further focused our attention by providing: "In broad outline, a court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict between the two. If it does not, a choice between the conclusions 'municipal affair' and 'statewide concern' is not required. . . . To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other.

"In those cases where the preliminary conditions are satisfied, that is, where the matter implicates a 'municipal affair' and poses a genuine conflict with state law, the question of statewide concern is the *bedrock inquiry* through which the conflict between state and local interests is adjusted. . . .

"The phrase 'statewide concern' is thus nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that facially discloses a focus on extramunicipal concerns as the starting point for analysis. By requiring, as a condition of state legislative supremacy, a dimension demonstrably transcending identifiable municipal interests, the phrase resists the invasion of areas which are of intramural concern only, preserving core values of charter city government. As applied to state and charter city enactments in actual conflict, 'municipal affair' and 'statewide concern' represent, Janus-like, ultimate legal conclusions rather than factual descriptions. Their inherent ambiguity masks the difficult but inescapable duty of the court to, in the words of one authoritative commentator, 'allocate the governmental powers under consideration in the most sensible and appropriate fashion as between local and state legislative bodies.' (Van Alstyne, Background Study Relating to Article XI, Local Government, Cal. Const. Revision Com., Proposed Revision (1966) p. 239.)

"In performing that constitutional task, courts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern. Beginning with the observation in *Pac. Tel. & Tel. Co.* v. *City and County of S. F.* [(1959)] 51 Cal.2d [766,] 771 [336 P.3d 514], that 'the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate,' our cases display a growing recognition that 'home rule' is a means of adjusting the political relationship between state and local governments in discrete areas of conflict. When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city.

"A corollary of that proposition is that every decision sustaining a state statute over a charter city measure does not mean that if the former were repealed, charter cities would remain incompetent to legislate in the area. Nor does a decision favoring a charter city measure preclude superseding state legislation in a later case if the fact-bound justification—the statewide dimension—is subsequently demonstrated. To approach the dichotomy of 'municipal affairs/statewide concern' as one signifying reciprocally exclusive and compartmented domains would, as one commentator has observed, 'ultimately all but destroy municipal home rule.'

"In cases presenting a true conflict between a charter city measure—whether tax or regulatory—and a state statute, therefore, the hinge of the

decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (*California Fed. Savings & Loan Assn. v. City of Los Angeles, supra*, 54 Cal.3d at pp. 16–18, fn. omitted, italics added.)

Our initial charge under *California Federal* is to satisfy ourselves "that the case presents an actual conflict" between the city's ordinance and state law. This requires a careful comparison between the purportedly conflicting provisions. On April 21, 2003, city, through its council, adopted ordinance No. 03-656, adding chapter 9.49 to West Hollywood's Municipal Code. The ordinance was entitled "Ban on Onychectomy (Declawing)" and provided as follows:

**"9.49.010 Findings.**

"a. There is a widespread misunderstanding in the community regarding a commonly performed surgical procedure known as onychectomy, or 'declawing.' Contrary to most people's understanding, declawing consists of amputating not just the claws but the whole phalanx (up to the joint), including bones, ligaments, and tendons.

"b. Declawing is not a simple cosmetic procedure akin to a manicure or a pedicure. On the contrary, to remove a claw, the bone, nerve, joint capsule, collateral ligaments, and the extensor and flexor tendons must all be amputated. Thus, declawing is not a 'simple,' single surgery but ten separate, painful amputations of the third phalanx up to the last joint of each toe. In human terms, this is akin to cutting off the last joint of each finger.

"c. Declawing robs an animal of an integral means of movement and defense. Because they cannot defend themselves adequately against attacks by other animals, declawed animals that are allowed outdoors are at increased risk of injury or death. Likewise, animals subjected to flexor tendonectomy, a procedure in which the animal's toes are cut so that the claws cannot be extended, are also robbed of an integral means of defense.

"d. Research has demonstrated that the rate of complication with onychectomy is relatively high compared to other procedures considered 'routine.' Complications can include excruciating pain, damage to the radial nerve, hemorrhage, bone chips that prevent healing, painful re-growth of deformed claw inside of the paw which is not visible to the eye, necrosis, lameness, and chronic back and joint pain as shoulder, leg and back muscles weaken.

"e. Although there is a widespread belief that declawing makes cats more 'house-friendly' and, therefore, less likely to be abandoned and subsequently

euthanized, a survey conducted by *Forgotten Felines and Friends of Caddo Parish* in Louisiana found that approximately seventy percent of cats surrendered to the city shelter were declawed.

"f. There are a number of alternatives to onychectomy (declawing) and flexor tendonectomy that involve no physical harm to the animal. Harmless alternatives include training the pet to use a scratchpost, use of deterrent pheromone sprays, covering furniture, restricting the pet's access to certain areas of the home, use of plastic nail covers, and more.

"g. Considering the wide array of alternatives, the City Council finds that the mere convenience of the onychectomy (declawing) and/or flexor tendonectomy procedures to the pet's guardian does not justify the unnecessary pain, anguish and permanent disability caused the animal.

"h. The City of West Hollywood enacts this ordinance pursuant to the authority vested in the city by Article XI, Section 7 of the California Constitution allowing a city to make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.

"i. The State Legislature has not endeavored to regulate, or delegate to any specified agency the authority to regulate, the types of veterinary procedures that may be performed within the State of California. Until the Legislature chooses to regulate these procedures, local governments are free to limit the types of procedures that may be performed within their jurisdiction for the protection of the public health, safety and general welfare.

"(Ord. 03-656 § 1 (part), 2003)

## "9.49.020 Onychectomy (Declawing) Prohibited.

"No person, licensed medical professional or otherwise, shall perform or cause to be performed an onychectomy (declawing) or flexor tendonectomy procedure by any means on any animal within the city, except when necessary for a therapeutic purpose. 'Therapeutic purpose' means the necessity to address the medical condition of the animal, such as an existing or recurring illness, infection, disease, injury or abnormal condition in the claw that compromises the animal's health. 'Therapeutic purpose' does not include cosmetic or aesthetic reasons or reasons of convenience in keeping or handling the animal. In the event that an onychectomy or flexor tendonectomy procedure is performed on any animal within the city in violation of this section, each of the following persons shall be guilty of a violation of this section: (1) the person or persons performing the procedure, (2) all

persons assisting in the physical performance of the procedure, and (3) the animal guardian that ordered the procedure.

"(Ord. 03-656 § 1 (part), 2003)"

The purportedly conflicting state statute which *California Federal* requires us to scrutinize to determine whether a genuine conflict exists is Business and Professions Code section 460. Section 460 provides generally that "No city or county shall prohibit a person, authorized by one of the agencies in the Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation, or profession or any portion thereof. Nothing in this section shall prohibit any city or county or city and county from levying a business license tax solely for revenue purposes nor any city or county from levying a license tax solely for the purpose of covering the cost of regulation."

Both parties to this litigation cite Business and Professions Code section 460 in support of their relative positions, but it is readily apparent that the mere generality of the section renders any assistance to either side somewhat problematical.

Following the dictates of our high court in *California Federal*, I find that a municipal/statewide conflict is presented by the two competing provisions. The conflict is clear and needs very little elaboration. Ordinance No. 9.49.020 states, "No person, licensed medical professional or otherwise, shall perform or cause to be performed an onychectomy (declawing) or flexor tendonectomy procedure by any means on any animal within the city, except when necessary for a therapeutic purpose." Juxtaposition to the ordinance is Business and Professions Code section 460 which says that "No city or county shall prohibit a person, authorized by one of the agencies in the Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation, or *profession* or *any portion thereof*." (Italics added.) The conflict is patent and presents a genuine dispute as required by the analytical first step stated in *California Federal,* in my opinion.

Having concluded that a genuine conflict exists in this instance, I shift attention to the second phase of analysis required under *California Federal,* namely, the question of statewide concern as "the bedrock inquiry."

Initially, I am in agreement with most of the majority opinion pertaining to rules seeking to determine legislative intent in interpreting a statute which is not otherwise clear and unambiguous on its face. The relevant state statute in question is Business and Professions Code section 460. Section 460 is general

in nature and does not address the subject matter of city's ordinance one way or another except by implication in its generality. Legislative history in turn fails to address the question of preemption by the state pertaining to the subject matter of the ordinance, but that does not mean we are clueless on legislative intent pertaining to nontherapeutic "declawing" of cats. We do have a history of legislative action on the subject from which intent on the part of the Legislature can be explored and reasonable assumptions made.

On page 551 of the majority opinion, at footnote 10, the majority refers to legislative history on the subject as follows:

"On February 14, 2003, several months prior to West Hollywood's adoption of ordinance No. 03-656 and a full year before he introduced Assembly Bill No. 1857 (2003–2004 Reg. Sess.), Assemblymember Koretz introduced Assembly Bill No. 395 (2003–2004 Reg. Sess.), which would have amended the [California Veterinary Medical Practice] Act by adding section 4826.5 to the Business and Professions Code to prohibit veterinary licensees from performing nontherapeutic surgical claw removal procedures on any cat. The bill was subsequently amended to limit its prohibition to nontherapeutic procedures performed on native, wild or exotic cats (Assem. Bill No. 395, as amended Jan. 5, 2004) and eventually died when it was not passed by the Assembly by January 31, 2004. (See Cal. Const., art. IV, § 10, subd. (c).) This initial attempt by Assemblymember Koretz to prohibit nontherapeutic declawing by licensed veterinarians, rather than his ultimately successful effort to add the prohibition as it relates to wild or exotic cats to the portion of the Penal Code dealing with animal cruelty, underscores the fact that at present the procedure is widely considered an acceptable part of the practice of veterinary medicine."

I come to the conclusion that the above mentioned history is a clear indication on the part of the state Legislature to address veterinarian "declawing" procedures as a matter of statewide concern. In recounting its actions on the matter by passage of legislation which eventually led to a dichotomy between "wild and exotic cats," and domestic cats, what inference is the court to draw other than the state Legislature has addressed a statewide concern and has decided that nontherapeutic "declawing" of wild or exotic cats is prohibited, but the procedure is permissible with respect to domestic or tame cats. It appears to this dissenting justice that the Legislature has addressed a statewide concern and the city's ordinance is preempted by state action.

A troubling aspect of the majority opinion lies in the lack of deference given to Department of Consumer Affairs (DCA) opinion No. 04-04 which comes to the conclusion that the ordinance in question is preempted by the California Veterinary Medical Practice Act (Bus. & Prof. Code, § 4800 et seq.). The majority, I respectfully suggest, merely gives a slight tip of the

hat in acknowledging the existence of the opinion, but little else. I agree with the majority that the opinion is not binding precedent that is entitled to stare decisis status, nevertheless I fail to see that the deference, or lack thereof, does justice to the opinion in this instance. I disagree with majority's statement on page 556 concluding that "Similarly absent in this case are factors suggesting the agency's interpretation is ' "probably correct," ' " citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 19 [78 Cal.Rptr.2d 1, 960 P.2d 1031]. To the contrary, factors exist in this matter suggesting that the DCA opinion is "probably correct" as discussed previously at length in this dissent. Additional factors militating in favor of "statewide concern" are accentuated by the DCA opinion. The DCA opinion states in part, "Such local regulation of veterinary practice in different jurisdictions would ultimately create a chaotic and confusing situation where it would be difficult for licensed veterinarians to know which veterinary procedures are legal or not depending on the jurisdiction. For local jurisdictions to regulate this aspect of veterinary practice is akin to local authorities imposing bans on physicians performing cosmetic surgery on people. Such a balkanization of professional practice ultimately would lead to different standards of practice throughout the state. Having different authorized and illegal veterinary medical practices throughout the state will inevitably make it very difficult for the Board to enforce the Veterinary Medicine Practice Act." (DCA Legal Opn. No. 04-04, Dec. 1, 2004, at pp. 4–5.)

The DCA opinion further states, "The city ordinance also does not accomplish its stated purpose of preventing the practice of onychetomy or flexor tendonectomy for non-medical reasons. Owners may freely go to a neighboring city and have the operation performed there and bring the cat back into the city. In this manner, the ordinance only adversely impacts the veterinarians in the City of West Hollywood. Whether the practice of performing an onychetory or flexor tendonectomy for non-medical reasons should be prohibited or not is ultimately a state policy question that should be addressed before the State Legislature." (DCA Legal Opn. No. 04-04, Dec. 1, 2004, at p. 5.)

I also note a comment in the DCA opinion stating, "Historically, surgical declawing is often necessary because of a severe medical or behavioral condition and has often been used as an alternative to abandonment or euthanasia" to be pertinent to counter the argument of the city that the ordinance is designed to prevent cruelty to animals. (DCA Legal Opn. No. 04-04, Dec. 1, 2004, at p. 4.) It appears to this dissenting justice that the syntax of the city's ordinance is constructed to elicit emotional reactions against the procedures in question by appealing to a practice purportedly involving animal cruelty, but in truth and in fact would lead to the propagation of animal cruelty in numerous instances as highlighted by the DCA opinion.

As a final comment, I note that the ordinance roams into the criminal penal realm by making it a crime not only for the veterinarian who violates the ordinance, but also any other persons who perform the procedure or physically assist in the prohibited procedure and the guardian (presumably the owner) of the animal that orders the procedure. In my opinion this diversion into the criminal arena, if nothing more, relegates the ordinance to the status of statewide concern.

In conclusion, I would affirm the decision of the trial court.

Respondent's petition for review by the Supreme Court was denied October 10, 2007, S154899. Moreno, J., was of the opinion that the petition should be granted.