Filed 2/22/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JASON RIDDICK et al., | B323731 |
| Plaintiffs, Cross-Complainants, and Respondents, | (Los Angeles County Super. Ct. No. 21SMCP00655) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| CITY OF MALIBU et al., | |
| Defendants, Cross-Defendants, and Appellants. | [NO CHANGE IN JUDGMENT] |

Pursuant to California Rules of Court, rule 8.264(c), it is ordered that the opinion filed on February 1, 2024, is modified as follows:

1. On page 4, section B, in the first sentence of the second paragraph, after "plaintiffs," add the next chronological footnote:

Among other documents in support of their application, plaintiffs submitted a December 7, 2020, letter that attached a copy of an April 21, 2020, memorandum from the executive director of the Coastal Commission regarding implementation of the recent ADU law stating that "the construction or conversion of an ADU . . . directly attached to an existing single-family residence would qualify as an exempt improvement to a single-family residence. (Cal. Code Regs, tit. 14, § 13250(a)(1).) Guest houses and 'self-contained residential units,' i.e., detached residential units, do not qualify as part of a single-family residential structure, and construction of or improvements to them are therefore not exempt development. (Cal. Code Regs, tit. 14, § 13250(a)(2).)" (Emphasis omitted.)

2. On page 6, the second line, at the end of the partial sentence, after "application.", add:

Plaintiffs attached, among other exhibits, two publications from the Coastal Commission: (1) an April 18, 2017, memorandum stating that "[t]o qualify as an exempt improvement to a single-family dwelling, an ADU must be contained within or directly attached to the existing single-family structure;" and (2) the April 21, 2020, memorandum referenced above stating that an ADU "directly attached to an existing single-family residence would qualify as an exempt improvement to a single-family residence."

3. On page 6, at the end of the first full paragraph that begins "On May 10, 2022, . . .", add:

Plaintiffs also acknowledged a January 2022 Coastal Commission publication that reconsidered its position in favor of exemptions for attached ADUs, but maintained that the Commission's new reasoning was flawed and that the interpretation of the City's LCP was a matter of law for the court to determine.

4. On page 13, at the end of the first full paragraph that begins "Finally, the wording . . .", add the next chronological footnote:

The City also advocates deference to the Coastal Commission's January 2022 publication reconsidering its prior position in favor of exemptions for attached ADUs. That guidance, however, contradicted prior Commission publications supporting plaintiffs' application, including the April 21, 2020, memorandum from its executive director. Despite plaintiff's' urging, the City ignored the Commission's prior guidance on the issue during the application process; it was not until this litigation arose that it adopted a more deferential posture towards such agency interpretations. Given the Commission's inconsistent positions on the issue within a relatively short timeframe, we decline the invitation to afford judicial deference to its most recent position on the issue. (See *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1278 ["[I]n the abstract, a current administrative interpretation would ordinarily be entitled to great weight. [Citation.] But when . . .

the construction in question is not 'a contemporaneous interpretation' of the relevant statute and in fact 'flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the . . . statute[,]' it cannot command significant deference"].)

The petition for rehearing is denied. There is no change in the judgment.

_____

RUBIN, P. J.                    MOOR, J.                    KIM, J.

4

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JASON RIDDICK et al., <br><br>     Plaintiffs, Cross-Complainants, and Respondents, <br><br>     v. <br><br> CITY OF MALIBU et al., <br><br>     Defendants, Cross-Defendants, and Appellants. | B323731 <br><br> (Los Angeles County Super. Ct. No. 21SMCP00655) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Young, Judge. Affirmed.

Best Best & Krieger, Trevor L. Rusin, Greg W. Kettles, Patrick Donegan, and John Natalizio, for Defendants, Cross-Defendants, and Appellants.

Pacific Legal Foundation, David J. Deerson, for Plaintiffs, Cross-Complainants, and Respondents.

# I. INTRODUCTION

The City of Malibu (the City) denied plaintiffs'[1] permit application to add an accessory dwelling unit (ADU) to their residence under state ADU standards.[2] Plaintiffs petitioned the trial court for relief and obtained an order directing the City to process the proposed ADU as exempt from coastal development permit (CDP) requirements.

On appeal, defendants[3] contend the trial court misinterpreted the City ordinance governing exemptions from the state's CDP requirement. In their cross-appeal, plaintiffs argue that, because they established a right to a permit under state ADU standards as a matter of law, the court should have ordered the permit to issue forthwith. We affirm the judgment in its entirety.

---

[1] Plaintiffs are Jason and Elizabeth Riddick, and Renee Sperling, Elizabeth's mother.

[2] The Legislature found and declared that California has a severe housing crisis and that ADUs provide "additional rental housing stock" in single-family residential zones and are thus "an essential component of California's housing supply." (Gov. Code, § 65852.150, subd. (a)(4), (5), (8).) Government Code section 65852.2 establishes state standards under which ADU permit applications must receive ministerial approval, including standards for parking, height, setback, landscape, architectural review, and maximum unit size.

[3] Defendants are the City, the Malibu City Council, and the Malibu Planning Department.

## II.  BACKGROUND

A.  *Coastal Development Regulatory Framework*

"The [California] Coastal Act [of 1976 (Coastal Act; Pub. Resources Code, § 30000)[4]] is a comprehensive scheme governing land use planning for the entire coastal zone of California. [Citation.] . . . With certain exceptions, 'any person wishing to perform or undertake any development in the coastal zone must obtain a [CDP] "in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency . . . ."' [Citations.]  The Coastal Act authorizes exemptions from the CDP requirement for certain minor developments such as improvements to existing single family residences and other structures.  (§ 30610.)

"The Coastal Act requires local governments to develop local coastal programs [(LCPs)], which consist of a land use plan and a local implementation plan.  [Citation.]  'Once the California Coastal Commission certifies a local government's [LCP], and all implementing actions become effective, the commission delegates authority over [CDPs] to the local government.'  [Citation.]" (*Venice Coalition to Preserve Unique Community Character v. City of Los Angeles* (2019) 31 Cal.App.5th 42, 47–48.)

All properties in the City are located within the coastal zone as defined by the Coastal Act and are therefore subject to its provisions, including the CDP requirement for proposed

---

[4]   All further statutory references are to the Public Resources Code unless otherwise indicated.

3

developments within that zone.[5]  The Coastal Commission certified the City's LCP in 2002.  (*City of Malibu v. Coastal Commission* (2012) 206 Cal.App.4th 549, 554.)  Chapter 13 of that LCP established the process for the review of all development within the City's coastal zone to ensure that it is consistent with the provisions of the Coastal Act.  Section 13.4.1 of that chapter (section 13.4.1) exempts "[i]mprovements to existing single-family residences" from the requirement of a CDP, with certain exceptions.  The interpretation of that section's exemption is at the core of the dispute between the parties.

B.      *Plaintiffs' Permit Application*

The Riddicks own and occupy, along with their children, a single-family residence in the City.  To accommodate Sperling's move into the residence, the family decided to construct "a small [ADU] attached to [the] residence . . . ."  On July 10, 2020, they applied for a permit to build "a new 414 square foot [ADU and a] 157 square foot addition" to the existing residence that included a new primary bathroom.

On June 7, 2021, following communications between the City and plaintiffs, the City's planning commission adopted a resolution denying plaintiffs' request for an ADU permit.  The commission concluded that a CDP was required for the project and refused to approve one, finding that the project did "not conform to the LCP as it violates residential development standards for required minimum rear and side yard setbacks and

---

[5]      The parties agree that the state's ADU standards do not "supersede or in any way alter or lessen the effect or the application of the [Coastal Act]."  (Gov. Code, § 65852.2, subd. (l).)

4

maximum allowed [total development square footage] and [total impervious lot coverage]."

On June 28, 2021, plaintiffs appealed the commission's denial of their requests for an ADU permit. On August 19, 2021, the City council held a noticed public hearing on the appeal and made findings in support of a resolution to deny the appeal.

On September 2, 2021, plaintiffs resubmitted plans to the City, advising that the new plans contained a modification: "[T]here will be no addition to the primary residence. Instead, the proposed space originally put forth as an addition to the primary residence is now designated as part of the ADU." (Emphasis omitted.)

On October 8, 2021, plaintiffs' counsel sent an e-mail to the City, emphasizing that the revised project was exempt from the CDP requirement and therefore entitled to ministerial review and approval.

On October 25, 2021, the City attorney responded that the proposed project required a CDP, without specifically addressing plaintiffs' modified plans.

C.  *Petition for Writ of Mandate*

On November 18, 2021, plaintiffs filed a complaint against defendants asserting causes of action for: Writ of administrative mandate (Code Civ. Proc., § 1094.5); traditional writ of mandate (*id.*, § 1085); declaratory relief (*id.*, § 1060); and violation of the Housing Accountability Act (Gov. Code, § 65589.5). The cause of action for traditional mandate asserted that defendants had a clear, present, and ministerial duty to review and approve plaintiffs' ADU permit application, and plaintiffs had a clear,

5

present, and beneficial right to approval of their permit application.

On May 10, 2022, plaintiffs filed an opening brief in support of their petition. On their claim for traditional mandate, plaintiffs argued that, under section 13.4.1, their ADU project was exempt from the CDP requirement and should therefore be processed and approved ministerially under state ADU standards (Gov. Code, § 65852.2).

On June 10, 2022, defendants filed their opposition brief. On the traditional mandate claim, defendants argued that their interpretation of section 13.4.1 was entitled to deference and they did not have a legal duty to process plaintiffs' permit application under Government Code section 65852.2 because that section specified that it did not "alter or lessen" the Coastal Act's CDP requirements.

In reply, plaintiffs argued that the City's interpretation of section 13.4.1 was not entitled to deference because: The unambiguous language of that section exempted attached ADUs from the CDP requirement; the City had no comparative interpretive advantage over the trial court; and there was no indication in the record that the City's interpretation was carefully considered or long-held and consistent.

D.    *Ruling on Traditional Mandate Claim*

On July 25, 2022, the trial court held a hearing on the claims asserted in plaintiffs' complaint and then took the matter under submission. The next day, the court issued a "Final Ruling" granting plaintiffs' claim for traditional mandate.

On the issue of giving deference to the City's interpretation of section 13.4.1, the trial court explained that "the proper interpretation of the [section] is a question of law for the [c]ourt's independent interpretation. The [c]ourt is certainly not bound by the City's (or Commission's) interpretation. Furthermore, the City's interpretation is not a long-standing opinion on this issue. In fact, the City (and Commission) ha[ve] admittedly reversed course with this decision. These circumstances weigh against finding deference."

On whether the language of section 13.4.1 unambiguously exempted plaintiffs' project from the CDP requirement, the trial court concluded that "the plain language of the statute fits [plaintiffs'] interpretation far better than the City's interpretation." On the relief to be granted, the trial court stated, "Plaintiffs requested . . . that the [c]ourt compel [defendants] to 'ministerially approve' the revised ADU under [Government Code] section 65852.2. However, the court cannot grant the requested relief to compel approval. The [r]ecord does not show that the City improperly denied the application on a ministerial basis. Instead, the City indicated [it] would not review the application at all. . . . [Plaintiffs] only justify that the City must decide the application within 60 days from the date it receives a completed application pursuant to Government Code section 65852.2. The [c]ourt does not order the City to grant or approve the application since the only prior determination was that the application required a CDP."

On September 19, 2022, the trial court entered a judgment granting plaintiffs' cause of action for traditional mandate and directing the City "to process [plaintiffs'] application in compliance with the [c]ourt's July 26, 2022, Final Ruling

7

attached hereto as Exhibit 'A.'" The judgment also denied each of plaintiffs' other causes of action.

On September 22, 2022, defendants filed a notice of appeal from the judgment and, on October 26, 2022, plaintiffs filed their notice of cross-appeal.

# III.    APPEAL

## A.    *Traditional Mandate*[6]

"Code of Civil Procedure section 1085, subdivision (a), . . . empowers courts 'to compel a public agency or officer to perform a mandatory duty.' [Citation.]  . . . [¶]  [Traditional m]andamus is appropriate to compel a 'ministerial' act, that is, "'an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.  . . . [Citation.]"  [Citations.]'  [Citation.]  Put another way, a ministerial act is one ""[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take,"'" thus ""eliminat[ing] any element of

---

[6]     "'To state a cause of action for a [traditional] writ of mandate, one must plead facts showing (1) a clear duty to act by the defendant; (2) a beneficial interest in the defendant's performance of that duty; (3) the defendant's ability to perform the duty; (4) the defendant's failure to perform that duty or abuse of discretion if acting; and (5) no other plain, speedy, or adequate remedy exists.' [Citation.]" (*Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230, 265 (*Waterkeeper*).)

discretion.""" [Citation.]" (*Waterkeeper, supra*, 92 Cal.App.5th at pp. 265–266, fn. omitted.)

B.    *Standard of Review*

The interpretation of a local ordinance is a legal issue subject to our de novo review.  (*Brookside Investments, Ltd. v. City of El Monte* (2016) 5 Cal.App.5th 540, 548, fn. 4.)

C.    *Statutory Interpretation*

The primary issue in this appeal involves the proper interpretation of the language in subdivision (A) of section 13.4.1. The City reads that section to exclude both attached and detached ADUs from the CDP exemption for improvements to existing single-family residences.  Plaintiffs maintain that the section exempts all improvements directly attached to existing single-family residences, including attached ADUs, from the CDP requirement and that only detached ADUs are excluded from the CDP exemption.

Section 13.4 of the City's LCP—entitled "**EXEMPTIONS FROM AND DE MINIMUS WAIVERS OF [CDPs]**"—states that "[t]he projects described in [s]ections 13.4.1 through 13.4.9 are exempt from the requirement to obtain a [CDP] . . . ."  Section 13.4.1 then provides:  "**13.4.1  Exemptions for Improvements to Existing Single-Family Residences**  [¶]  A.  Improvements to existing single-family residences except as noted below in (B).[7]  For purposes of this section, the terms 'Improvements to

---

[7]    The parties agree that the proposed ADU does not fall within any of the classes of development listed in subdivision (B).

9

existing single-family residences' includes all fixtures and structures directly attached to the residence and those structures normally associated with a single family residence, such as garages, swimming pools, fences, storage sheds and landscaping but specifically not including guest houses or accessory self-contained residential units."

We review ordinances under the same rules of construction that we review statutes. (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290.) "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165–166.)

## 1.  Deference to the City's Interpretation

Defendants maintain that we should give "great deference" to their interpretation of section 13.4.1 and adopt it unless clearly erroneous.  Plaintiffs counter that because both the plain text and legislative history support their view of the statute, the City's interpretation is entitled to "little-to-no deference . . . ."

"To the extent we are engaging in statutory interpretation, 'we must give deference to [an agency's] interpretations, but not to the exclusion of other tools of statutory construction.'" (*ACCO Engineered Systems, Inc. v. Contractors' State License Bd.* (2018) 30 Cal.App.5th 80, 87.)  As the court in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*) explained, "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court.  Depending on the context, it may be helpful, enlightening, even convincing.  It may sometimes be of little worth.  [Citation.]  Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. . . . 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.'  [Citation.]" (*Id.* at p.7–8.)

We conclude that, under the circumstances of this case, defendants' interpretation of section 13.4.1 is not entitled to deference.  As explained below, neither the language of section 13.4.1, subdivision (A) nor its legislative history are ambiguous; thus there is no need to defer to defendants' interpretation. (*Advanced Real Estate Services, Inc. v. Superior Court* (2011) 196

11

Cal.App.4th 338, 350; *Department of Industrial Relations v. Occupational Safety & Health Appeals Board* (2018) 26 Cal.App.5th 93, 106.)

Moreover, even if there was some ambiguity concerning the meaning of the text, it is not composed of "'technical, obscure, complex, open-ended'" language "'entwined with issues of fact, policy, and discretion'" that would require resort to defendants' specialized expertise. (*Yamaha, supra*, 19 Cal.4th at p. 12.) Defendants therefore "enjoy[] no comparative advantage over a generalist court in interpreting the legal text at issue." (*California Veterinary Medical Association v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 556.)

Furthermore, the record does not reflect that defendants' interpretation was the result of careful consideration by senior agency officials or that defendants consistently maintained their interpretation, especially over a long period of time. (See *Yamaha, supra*, 19 Cal.4th at p. 13.) Instead, defendants' interpretation appears to be a matter of first impression, initially made by planning department staff in response to plaintiffs' attached ADU proposal. Indeed, there is no indication in the record that City planning officials carefully deliberated and weighed the decision to require a CDP in this case and nothing to suggest that they had been confronted with the same or a similar issue in the past and consistently determined that a CDP was required. (See *Yamaha Corp. of America v. State Board of Equalization* (1999) 73 Cal.App.4th 338, 352 [deference appropriate if the agency determination is not "adopted ad hoc as a litigating position in this case only," but rather is one the agency has maintained "consistently for at least 20 years"].)

12

Finally, the wording of the statute at issue was not crafted by City planning officials in response to some unique local conditions or considerations, such that they would be in the best position to understand and explain its meaning. As discussed below, that language was adopted in 2002 as part of the City's LCP as mandated under the Coastal Act (§§ 30500–30526; *Pacific Palisades Bowl Mobile Estate, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 794).) And, it appears to be based, almost verbatim, on an implementing regulation promulgated by the Coastal Commission. (Cal. Code Regs., tit. 14, § 13250, subd. (a).) Thus, City officials would be in no better position than a court of this state when interpreting the Coastal Commission's intent in adopting that regulation.

2.      Plain Meaning of Section 13.4.1

We agree with the trial court that, under the plain meaning rule, the language of section 13.4.1, subdivision (A) includes attached ADUs in the class of improvements to existing single-family residences that are exempt from the CDP requirement. The title and first sentence of the subdivision establish that improvements to existing single-family residences are exempt as a class, "except those noted below in (B)." That language is broad and subject only to the exceptions in subdivision (B), none of which is implicated here.

The next sentence defines "improvements" broadly, and consists of two distinct categories of structures: (1) all structures directly attached to the residence, and (2) other structures normally associated with a single-family residence, such as garages and swimming pools. The first category of

13

improvements, all "directly attached" structures, is unqualified and therefore evinces an intent to exempt any such attached improvements. The second category, structures "normally associated" with single-family residences, is qualified by a list of four examples of detached structures that are included in the definition and, in the final clause of the definition, a specification of two types of detached structures that are deemed excluded.

Under that bifurcated definition, the specification of excluded structures in the final clause of subdivision (A) modifies and applies only to "normally associated" structures, and not to the first category of "structures directly attached . . . ." The common sense reading of the two separate categories suggests that the drafters of subdivision (A) intended to differentiate between attached structures and normally associated detached structures, with all of the former being exempt from the CDP requirement and most of the latter also being exempt, unless they specifically qualify as either a guest house or an accessory self-contained residential unit. When, as here, "the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

3. Legislative History

Even if the language of section 13.4.1, subdivision (A) was susceptible to more than one reasonable meaning, the legislative history in the record[8] confirms our interpretation that ADUs

---

[8] The City did not provide any historical documents demonstrating its intent in enacting section 13.4.1. Nor did it include such documents for the Coastal Commission regulation

14

directly attached to existing residences are exempt from the CDP requirement. "It is an established principle that where statutory language is unambiguous, a court is precluded from considering legislative history. (See, e.g., *People v. Robles* (2000) 23 Cal.4th 1106, 1111 ['If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.] If, however, the statutory language is susceptible of more than one reasonable construction, we can look to legislative history in aid of ascertaining legislative intent[ ]'].) . . . [T]he plain meaning rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. [Citation.] Courts have therefore considered legislative history even in cases where the text of a statute is clear; but only to confirm the interpretation already apparent from the plain language, not to advance an alternative meaning. [Citations.]" (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 755.)

As noted, the language of section 13.4.1, subdivision (A) was taken almost verbatim from the Coastal Commission regulations[9] implementing section 30610, subdivision (a). That

upon which section 13.4.1 is modeled, namely, California Code of Regulations, title 14, section 13250, subdivision (a).

[9] Defendants do not deny that section 13.4.1 was taken from, and closely mirrors, the language of a Coastal Commission regulation that defines improvements to existing single-family residences; but they insist that certain variations in syntax, paragraph structure, and language between the LCP section and the state regulation demonstrate the City's intent to exclude attached ADUs from the category of attached structures excluded from the exemption of the CDP requirement.

15

section of the Coastal Act provides: "Notwithstanding any other provision of this division, no [CDP] shall be required pursuant to this chapter for the following types of development and in the following areas: [¶] (a) Improvements to existing single-family residences; provided, however, that the commission shall specify, by regulation, those classes of development which involve a risk of adverse environmental effect and shall require that a [CDP] be obtained pursuant to this chapter."

The Coastal Commission's definition of the term "[i]mprovements to existing single-family residences," as used in section 30610, subdivision (a), is set forth in California Code of Regulations, title 14, section 13250, subdivision (a) which provides: "(a) For purposes of . . . section 30610[, subdivision] (a), where there is an existing single-family residential building, the following shall be considered a part of that structure: [¶] (1) All fixtures and other structures directly attached to a residence; [¶] (2) Structures on the property normally associated with a single-family residence, such as garages, swimming pools, fences, and storage sheds; but not including guest houses or self-contained residential units; and [¶] (3) Landscaping on the lot."

That definition makes clear that there are two distinct categories of improvements that qualify as exempt by dividing them into two separately numbered paragraphs. Paragraph (1) states that "all" structures "directly attached" to existing residences are among those exempt. Paragraph (2) then states that other structures "on the property," meaning those not directly attached to the residence, are also exempt if they are normally associated with single-family residences and similar to the four types of detached structures listed as examples. But

16

paragraph (2) then expressly excludes from the second category of detached structures only guest houses and self-contained residential units.

Under the Coastal Commission definition, directly attached structures, including ADUs, are exempted from the types of developments that require CDPs under the Coastal Act. We therefore reject defendants' contention that in enacting section 13.4.1 of the LCP—as mandated by the Coastal Act—the City harbored an unexpressed intent to alter materially the meaning and effect of the regulation upon which it is based. The minor differences in language between the two provisions do not support a reasonable inference that the City had any such intent. And, as explained, the difference in the paragraph composition shows that the original drafters of the regulation meant what they said: Directly attached structures of all types are exempt.

4.      Harmonizing Section 13.4.1

Defendants contend that plaintiffs' interpretation of subdivision (A) of section 13.4.1 is internally inconsistent with certain language in the subdivision itself and at odds with other provisions of the statutory scheme of which it is part. According to defendants, "[t]o adopt [that] interpretation would lead to absurd results."

Defendants' only example of internal inconsistency is based on the second category of exempt structures, namely, those normally associated with single-family residences. According to defendants, the final clause of subdivision (A) cannot be read to apply only to "normally associated" structures because guest houses and accessory self-contained residential units are not

17

normally associated with single family residences; instead, they are a "rare addition to a home . . . ." But their assertion is contrary to the plain language of the long-standing Coastal Commission definition, which expressly includes guest houses and accessory self-contained residential units in the category of structures normally associated with single-family residences. (Cal. Code Regs, tit. 14, § 13250, subd. (a)(2).) Thus, reading section 13.4.1 to include guest houses and accessory self-contained residential units among the types of detached structures normally associated with single-family residences comports with the Coastal Commission's understanding of those types of structures and does not render section 13.4.1 internally inconsistent.

Defendants also argue that plaintiffs' interpretation of section 13.4.1, "to exempt attached guest houses and accessory self-contained residential units[,] also nullifies some of the language of section 13.13.1 [of the City's LCP]."[10] According to

_____

[10]    Section 13.13.1 provides: "A.  The planning manager may process consistent with the procedures in this chapter any [CDP] application for the specific uses identified below, except a proposed [CDP] that is appealable or is within the Commission's continuing jurisdiction as defined in Chapter 2 of the Malibu LIP (Definitions). [¶]  1.  Improvements to any existing structure;  [¶] 2. Any single-family dwelling;  [¶]  3. Lot mergers;  [¶]  4. Any development of four dwelling units or less that does not require demolition, and any other developments not in excess of [$100,000] other than any division of land;  [¶]  5. Water wells. [¶]  6.  Driveways or access road improvements required by the fire department . . . .

"B.     Notwithstanding any other provisions of the LCP, attached or detached second dwelling units shall be processed as administrative permits, except that the approval of such permits

18

defendants, under that section both "'attached and detached second dwelling units, i.e., guest houses and accessory self-contained residential units'" require administrative CDPs. They therefore conclude that, to "interpret section 13.4.1[, subdivision] (A) to exempt attached second dwelling units . . . would effectively delete the term 'attached' in section 13.13.1[, subdivision (B)]."

Contrary to defendants' assertion, the language of section 13.4.1 can be reasonably construed to harmonize with section 13.13.1, which does not state that attached guest houses and accessory self-contained residential units require CDPs. Instead, subdivision (A) provides that the planning manager (as opposed to the planning commission) "may" process any CDP permit application for the types of projects listed in subparts 1 through 6, including "[i]mprovements to any existing structure." Subdivision (B) specifies that applications for "attached or detached second dwelling units" "shall" be processed by the planning manager as administrative CDPs. The section does not define when a CDP is required for a particular type of improvement. Instead, it provides the administrative process by which a permit application will be processed—as between the planning commission and the planning manager—in the event a proposed improvement requires a CDP. By comparison, section 13.4.1 provides that some improvements to single-family residences, as defined in subdivision (A), do not require a CDP, while others, as listed in subdivision (B), must receive such permits. Thus, section 13.13.1, dealing only with the latter types

shall be appealable to the Coastal Commission if the project is located in the appealable zone. [Citations.]"

19

of projects, does not conflict with section 13.4.1 as interpreted by plaintiffs.

Defendants further contend that plaintiffs' interpretation would "effectively delete the term 'attached' from the definitions of 'guest house' and 'second unit'" in section 2.1[11] of the City's LCP. But they do not adequately develop this one-sentence contention or explain why the general definitions at the beginning of the LCP, including the definition of "second unit," must be harmonized with a specific section defining those improvements to single-family residences that are exempt from the CDP requirement. (See *People v. Rodriguez* (2022) 79 Cal.App.5th 637, 642 [although courts must attempt to harmonize different statutory sections, that analysis is limited to "statutory sections relating to the same subject" and only "to the extent possible"].)

Finally, defendants argue that it would be inconsistent with the LCP statutory scheme to exempt attached accessory self-contained residential units from the CDP requirement as the LCP seeks generally to require "'any development'" proposed in the City to be reviewed pursuant to that process and most of the exemptions from that process are for projects that "neither

---

[11] Section 2.1 defines "guest house" as: "[A]ttached or detached living quarters on the same premises as a single family residence for the use of family members, guests or employees of the occupants of such residence, containing no kitchen facilities and not rented or otherwise used as a separate dwelling." It defines a "second unit" as: "an attached or detached residential dwelling unit which provides complete independent living facilities for one or more persons. It shall include permanent provisions for living, sleeping, eating, cooking, and sanitation on the same parcel as the single family dwelling is situated."

intensify use nor significantly expand development." According to defendants, because attached ADUs increase intensity of use, "[i]t would make no sense for the [LCP] to exempt [them] from the [CDP] requirement while requiring projects with equal or smaller increases in intensity of use, including detached ADUs, to obtain a [CDP]."

Under subdivision (B) of section 13.4.1, certain classes of development are not exempt from the CDP requirement if "they involve a risk of adverse environmental impact" including improvements (such as attached ADUs) to single-family structures in locations, such as on a beach or in a wetland. That provision, when read together with the plain language of subdivision (A), reflects a policy choice to treat single-family residences located in environmentally sensitive areas differently from residences in other areas of the coastal zone.

Although the wisdom of such policy choices is often subject to debate, that is not a factor which we may consider in interpreting section 13.4.1. Given the plain meaning of the language used by the Legislature, we assume that it meant what it said, without questioning the policy determinations reflected in that language.

## IV.   CROSS-APPEAL

Plaintiffs contend that, under the trial court's order requiring the City to review and approve their permit application under applicable state ADU standards, there is no dispute that they are entitled to have the permit issued, without further submissions on their part of any kind. According to plaintiffs, the City has not adopted its own ADU ordinance and is therefore

bound to follow the state default standards in Government Code section 65852.2.[12]  As plaintiffs view the record, their pending application meets all of those required state standards.

## A.    *Procedural Background*

In their cause of action for traditional writ of mandate, plaintiffs alleged that they had a "right to ministerial review and approval of their revised ADU proposal" and were "entitled to an order directing the City to accept the revised ADU proposal for ministerial review and to approve the same within the time limit mandated by [s]tate law."  In their prayer, they confirmed the extent of the relief they sought on that cause of action:  A "writ of traditional mandate compelling [defendants] to ministerially approve [their] revised ADU application . . . pursuant to Government Code [s]ection 65852.2."

Following the hearing on plaintiffs' traditional writ of mandate claim, the trial court issued a July 26, 2022, final ruling on that claim granting it and ruling that "[plaintiffs] only justify that the City must decide the application within 60 days from the

---

[12]    Government Code section 65852.2, subdivision (b)(1) provides, in pertinent part:  "When a local agency that has not adopted an ordinance governing accessory dwelling units in accordance with subdivision (a) receives an application for a permit to create or serve an accessory dwelling unit pursuant to this subdivision, the local agency shall approve or disapprove the application ministerially without discretionary review pursuant to subdivision (a).  The permitting agency shall either approve or deny the application to create or serve an accessory dwelling unit . . . within 60 days from the date the permitting agency receives a completed application . . . ."

22

date it receives a completed application pursuant to Government Code section 65852.2.  The [c]ourt does not order the City to grant or approve the application since the only prior determination was that the application required a CDP."

On August 31, 2022, plaintiffs filed a motion to enforce judgment, seeking a determination that "their updated ADU application [was now] complete and that the City must decide the application within 60 days from August 17, 2022, the date of its completion."  Based primarily on factual matters that occurred after the trial court's final ruling, plaintiffs urged the court to construe and enforce its ruling by entering a subsequent order finding that plaintiffs had submitted a completed application and ordering the City to review it under appropriate standards by October 16, 2022.

On September 19, 2022, the trial court entered a judgment on its final ruling that granted the request for traditional mandate and directed defendants "to process [plaintiffs'] application in compliance with the [c]ourt's July 26, 2022, Final Ruling attached hereto as Exhibit 'A.'"

On October 26, 2022, plaintiffs filed a notice of cross-appeal from this judgment only.

On November 9, 2022, the trial court issued a minute order denying plaintiffs' motion to enforce the court's final ruling. Plaintiffs did not separately appeal that postjudgment order.

B.   *Analysis*

In their cross-appeal, plaintiffs argue that they were entitled to a permit within 60 days of their completed application, which they claim was October 16, 2022. Plaintiffs' arguments in their cross-appeal therefore appear to arise from matters that occurred following the final ruling on which the judgment is based, such as their efforts to submit the additional information and payment they deemed necessary to complete their ADU application.[13] Because, however, their cross-appeal is limited to the judgment, and not taken from any separate postjudgment ruling on enforcement, the matters they urge us to adjudicate are not properly before us on the cross-appeal. We therefore affirm the judgment.

---

[13] Ordinarily, a complaint speaks only as to matters which occurred as of the date it was filed; matters occurring *after* filing are raised by a supplemental complaint. (See *Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1032.)

24

## V.    DISPOSTION

The judgment is affirmed in its entirety.  The parties are to bear their own costs on appeal.

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.